# STATE v. HOUGENSEN

No. 5529.   Decided December 28, 1936.   (64 P. [2d] 229.)

354

*Vene L. McCarthy,* of Salt Lake City, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

WOLFE, Justice.

Early in the morning of May 30, 1933, defendant, coproprietor of the "C-C" Restaurant, shot Frank Miller, who died the same day from the wounds. The shooting occurred in the said restaurant. The only witness to the shooting, outside of the defendant, was Mrs. Miller, purported wife of deceased. Defendant testified he was attacked by Miller with a knife and shot to defend himself. Mrs. Miller testified defendant put his arm around her and Mr. Miller hit at

him, whereupon defendant caught Miller by the wrist and twisted him to the floor; that she asked deceased to go home with her; that they both started and as they were on their way, defendant appeared and fired one shot; that she ran into the street and immediately thereafter heard two more shots. There had been much drinking previous to the shooting among defendant, Mr. Miller, one Allen, and one Sheeley, in which Mrs. Miller joined to some extent. Defendant was charged with murder and convicted of voluntary manslaughter. He appeals.

We need not at this time present any other of the background facts in order to understand the questions presented by the assignments. By assignments 1 to 7, inclusive, defendant raises the question of whether on cross-examination, prior conduct, acts or actions, specific in nature, may be elicited in order to affect credibility. The seven alleged errors covered by the assignments relate to the claimed refusal of the court to allow, over objection as to relevancy and competency, the defense attorney on cross-examination of Mrs. Miller to go into the matter of specific past acts and conduct of the witness in order to show that she was a woman of such character whose evidence should not be relied upon. Especially important does the question become in view of the fact that the defendant probably could not have been convicted without her evidence.

The questions to which it is claimed objections were sustained are here set out with numbers corresponding to their assignments:

No. 1: "Q. Didn't you make an affidavit in Los Angeles under that name [meaning Howard]?"

No. 2: "Q. Who are you living with now?"

No. 3: "Q. You are living now with this man Allen that you met in the C & C Cafe?"

No. 4: "Q. You know what is the meaning of the word 'hustler'?"

No. 5: "Q. Didn't you go out on the streets and solicit money from men a day or two before the shooting?"

No. 6: "Q. Do you know what 'pimps' are?"

No. 7: "Q. You told her how he made this money he gave to you to provide for you?"

She denied that she used the name Howard, but defendant was not able to pursue the inquiry to see if she had signed an affidavit under that name. It appears that as to question No. 3 the court said, "It will be held in abeyance until it can be heard." As to No. 4, it was answered later when she denied she was a "hustler on the streets in Salt Lake City." As to No. 5, she denied solicitation and denied Miller was her "pimp," thus answering that question and indirectly the question involved in assignment No. 6. This leaves Nos. 1, 3, and 7 to consider. The purpose of asking her whether she went under the name of Howard, whether she was living then with Allen whom she met on the night of the killing, whether she solicited money from men a day or two before the shooting, of eliciting from her a knowledge of how Miller made his money, were all only for the purpose of impairing her credibility. There are two methods of discrediting evidence. First, to show that the evidence itself is untrue and unreliable; and, second, to show that the transmitter of the testimony is unreliable, either because of bad memory, failure to accurately record impressions, or because of lack of veracity. If the vehicle which conveys testimony is unreliable for that purpose, the testimony is apt itself to be unreliable. One can affect the vehicle by showing that the witness has a bad reputation for truth and veracity. *State* v. *Hansen*, 40 Utah 418, 122 P. 375. One can affect it by showing that a defendant in a criminal case has a bad character as to a particular trait involved in the commission of the crime, but only after evidence of defendant's good character in that respect has been received. *State* v. *Thompson*, 58 Utah 291, 199 P. 161, 38 A. L. R. 697. Evidence of contradictory statements of a witness may affect the reliability of the testimony directly or impeach the transmitter of the evidence as a reliable vehicle to register and convey facts and impressions, de-

pending upon whether the contradictory statements are used for impeachment or for substantive evidence in the form of admissions—in the latter case when the witness is a party. Can a witness in a criminal case be cross-examined on collateral matters for the purpose of affecting his credibility as a witness or, as stated above, impairing his worth as a dependable vehicle to give true evidence? In the consideration of this question, great care must be exercised to distinguish those previous acts or conduct of a witness which may be given to meet some issue in the case other than mere credibility. In *State* v. *Smith*, 90 Utah 482, 62 P. (2d) 1110, recently decided, we held that evidence of prior sexual acts might be given if they were such as might be used to counteract an inference that the defendant had intercourse with the prosecutrix created by a doctor's testimony that an examination of the prosecutrix revealed that she had had sexual intercourse; that such evidence might also be given where it was shown that she was accusing one person to shield or protect another or to divert blame from herself. These are not matters purely affecting credibility, but matters affecting the issue of whether defendant did or did not commit the act charged as the crime. In the question presented by these four assignments of error, we have had no appreciable aid from either the brief of defendant or the state. Not a Utah case is cited or discussed.

There is an irreconcilable conflict in authorities, not only among the different states, but among the decisions of many particular states, including our own. The reason will presently appear. In 28 R. C. L. 610, § 200, it is stated:

"In some states evidence of particular acts of misconduct which tend to disgrace him cannot be elicited from a witness on cross-examination for the purpose of impeaching him any more than it can by the testimony of other witnesses, and provision to this effect is sometimes made by statute. In most jurisdictions, however, a witness may be specially interrogated on cross-examination in regard to specific acts, however degrading, for the purpose of testing his credibility."

Starting on page 410 of 65 A. L. R. is a note which deals with the right to elicit from the witness acts of sexual immorality in order to affect credibility. It is stated:

"A thorough investigation of the decisions shows that there is rather abundant authority to support either side of the topic under discussion. In dealing with this subject the courts have drawn many fine points of distinction, and a close study of the cases has caused them to be resolved into the various classes as set forth in the scheme."

It is further stated that "from a jurisdictional standpoint, the balance of the authorities appears inclined to the view that a witness may be cross-examined as to sexual morality, for the purpose of affecting his or her testimony." Eighteen jurisdictions are listed as adopting this majority rule and from these jurisdictions about one hundred cases are cited. Utah is included through the decision of *State* v. *Williams*, 49 Utah 320, 163 P. 1104, as supporting the majority rule. Seventeen jurisdictions are given as adopting the minority rule. We have examined many of the cases cited as supporting both rules. If those cases in which the cross-examination went to serve not only an attempted impairment of credibility, but some issue in the case, are counted out, we are not so sure that the jurisdictions would stand eighteen to seventeen in favor of the majority rule. Thus in the case of *Ingersol* v. *McWillie*, 9 Tex. Civ. App. 543, 30 S. W. 56, where a witness was required to answer whether she had not sustained illicit relations with decedent before his marriage in a contest over the right of administration, when she had testified to confidential declarations of decedent to her, mitigating strongly against one of the contestants, the relationship was exposable on the question of motive. Her relationship with deceased may have influenced her to testify against the common-law wife who was in effect a contestant. The difficulty of the study is enhanced by these special cases. It is, of course, not so important to determine which is the majority and minority rule, as it is to lay down common-sense rules. The difficulty

in doing so—and this causes the hopeless conflict in decisions—is that there are two opposing considerations which press themselves on the courts. The courts have recognized that the testimony of a dissolute person is generally not to be given the credence of a person of upright character; that the value of the evidence largely depends on the type of vehicle which brings it to the courtroom. Therefore, it has strongly appealed to the sense of justice that the cross-examiner should be able to reveal to the jury the sort of person who gives the testimony and that the jury is entitled to take that into account as one of the very important bases for determining the value of any person's testimony. The most broad rule is laid down in *Carroll* v. *State*, 32 Tex. Cr. R. 431, 435, 24 S. W. 100, 40 Am. St. Rep. 786, where it was held that a witness might on cross-examination be asked any question which tended to test his accuracy, veracity, or credibility, or shake his credit by injuring his character, and that he might be compelled to answer such a question, however irrelevant to the facts in issue, and however disgraceful to himself, except when the answer might expose him to a criminal charge. On the other hand, the courts have also recognized that collateral facts as to witness' conduct in order to reveal his character ofttimes form no reasonable basis for an assumption that he will not tell the truth, and simply prejudice the jury (*State* v. *Williams*, 36 Utah 273, 103 P. 250), injure his or her reputation, and make witnesses who might otherwise be available very reluctant to offer to testify. Thus bringing out the fact that a woman has had an illegitimate child or that a man has committed adultery would hardly be sufficient to base an assumption that they were not creditable witnesses as bystanders to an automobile accident or to a robbery. Yet if the illegitimate child or the adultery were multiplied or with other acts and conduct were indication of such moral deterioration as to affect the credibility of the witness, it would be important that the jury know that fact. But the fact that persons have been sexually irregular in their lives does not necessarily

stamp them as untruthful in matters unrelated to such irregularities. Moreover, the inquiry may prove a herring across the trail in that it diverts the attention of the jury from the main issues to collateral matters. These preliminary observations at least pose the problem. How stands our own state on this question?

In the first place, it is well to keep in mind that we have a statute which appears to govern the matter. Section 104-49-20, R. S. Utah 1933, reads as follows:

"A witness must answer questions legal and pertinent to the matter in issue, though his answer may establish a claim against himself; but he need not give an answer which will have a tendency to subject him to punishment for felony; nor need he give an answer which will have a direct tendency to degrade his character, unless it is to the very fact in issue or to a fact from which the fact in issue would be presumed. But a witness must answer as to the fact of his previous conviction for felony."

This section was adopted from section 2065, California Code of Civil Procedure and first introduced into our law as section 392 of the Civil Practice Act of February 17, 1870, and has been carried in all the compilations since. It might be fairly conclusive of the questions raised by ■ the aforesaid assignments were it not for the fact that it was held in *State* v. *Williams,* supra, that the immunity from the requirement to answer is a personal privilege which must be claimed by the witness, or at least by his counsel. In the instant case, the objections to the questions were the formal objections as to relevancy and competency. The witness, Mrs. Miller, or her counsel, did not claim the privilege. Therefore, this court must determine whether, independent of said statute, it is the right of the cross-examiner in this jurisdiction to bring out matters which may reflect on the character of the witness. Certainly, if counsel, knowing that a witness should not be compelled to answer, regardless of the exercise of her personal privilege, should by asking a number of questions which implied immorality, for the purpose of carrying to the jury such impression and which it

was fairly evident did carry to the jury such an impression, this court might reverse the case with censure on counsel, whether or not the witness claimed her privilege. *State* v. *Lasson*, 292 Mo. 155, 238 S. W. 101. These tactics have sometimes been employed. It becomes, therefore, necessary to determine whether counsel in the absence of privilege claimed, have an absolute right to elicit on cross-examination matters not relevant to the issues of the case, but which may bear on credibility.

Before examining the Utah cases, it is well that we determine definitely what is or is not required to be answered under section 104-49-20. The witness must answer questions "legal and pertinent to the matter in issue," unless such answer will tend to subject him to punishment for a felony. "Pertinent to the matter in issue" includes those collateral matters, if any, in regard to which a witness may be examined to test the credit the jury should give him, otherwise there would be no occasion to exempt questions tending to degrade his character unless on the very fact in issue or a subfact from which such fact could be presumed; that is, if this phrase were given the narrower meaning of "pertinent to establish the matter in issue," such collateral matters would be excluded alone by reason of not being "pertinent to the matter in issue." It will be noted that many of the cases reveal an interrogation into conduct which would tend to incriminate. The witness may save him or herself from answering such questions whether directly pertinent to the issues or whether for the purpose of testing credit by claiming privilege. But many times the conduct is outlawed as a basis for criminal action or while not criminal, casts reflections upon a witness and tends to degrade his character. For instance, the question as to whether she was not out with some notorious character or whether she did not allow someone to become too familiar with her in a car, or, as in the case of *Shepard* v. *Parker,* 36 N. Y. 517, where a married woman, in a suit on a note, was asked whether she had not held out signals to the man who

gave her the note which she claimed was given to her in settlement of private damages and not in compromise of a rape; or as in the case of *Sharon* v. *Sharon,* 79 Cal. 633, at page 674, 22 P. 26, 131, where a witness was asked whether, when a will was admitted to probate, she did not swear her husband was of sound mind when in fact she knew he was not, she further testifying that in the formal proceedings of admitting the will she did not realize a false swearing as to such fact. Should the witness either when the question calls for an answer collateral to the case but tends to incriminate or degrade character be required to interpose personal privilege and thus largely leave the same impression with the jury that would have been left by an admission, or can the court rule out evidence of such specific acts on the ground that they are irrelevant even as tending to impair credibility?

We shall first examine the Utah cases to see how stands the law in this jurisdiction. In *People* v. *Hite,* 8 Utah 461, at page 473, 33 P. 254, 256, it was said:

"In his cross-examination the prosecuting attorney went still further back, and his inquiry descended still further into particulars. He interrogated the defendant as to transactions evidently for the purpose of testing his recollection, and of bringing to light conduct that would affect his credibility. * * *

"To enable the juror to judge of the credibility of the witness, rigid cross-examinations are sometimes necessary, and much latitude of inquiry should be permitted. The investigation of truth is sometimes attended with the humility and disgrace of the witness, and appears to be remorseless."

The court quoted with approval from *Territory* v. *O'Hare,* 1 N. D. 30, 44 N. W. 1003, as follows:

"It is well settled that witnesses who are not parties may, for the purposes of impeachment, and within the sound discretion of the trial court, be required to testify as to facts tending to degrade them, which are collateral to the issue. * * * We hold that the right of cross-examination as to outside matters of fact, which affect the general character of the witness, and tend to degrade him and affect

his credibility, is, within the limits of a sound judicial discretion, a salutary rule."

Section 104-49-20, R. S. 1933, which, as has been stated above, has been a part of our law since 1870 (section 392, Civil Practice Act of 1870 and section 1253, Code Civ. Proc. of 1884), was consequently in force in 1893 when the Hite Case was decided, but nothing was said regarding it.

In *People* v. *Larsen*, 10 Utah 143, 37 P. 258, it was held that the witness, who was asked, "Have you ever been arrested for a crime similar to this?" was required to answer unless he personally claimed the privilege of the statute; that counsel could not claim it for him. (In *State* v. *Shockley*, 29 Utah 25, 80 P. 865, 873, 110 Am. St. Rep. 639, it was held the objection on grounds of crimination could be urged by counsel.) This is contrary to *Conway* v. *Clinton*, 1 Utah 215, where it was held that the question, "Were you not convicted * * * of keeping a house of prostitution?" was not improperly excluded, it being said that it is a well settled rule that "a witness is not bound to answer, nor a court to compel answer to an inquiry to disgrace a witness unless the evidence is material to the issue being tried," citing, not section 392 of the Civil Practice Act of 1870, but several New York decisions. The court further said, "Doubtless * * * the question was asked with a view to disparage the witness and affect her credibility. * * * The Court in its discretion, may permit disparaging questions to be asked, but when they are irrelevant to the issue [we assume even though they may be relevant to credibility] it is not error to exclude them." It was stated in *Rex* v. *Pitcher*, 1 Car. & P. 85, that the English rule is given to be that "In Practice the asking of questions to degrade the witness is regulated by the discretion of the learned Judge in each particular case."

*State* v. *Marks*, 16 Utah 204, 51 P. 1089, dealt with evidence of character introduced in the only form possible by direct evidence; that is, reputation. It held that the inquiry

should be as to the general reputation for truth and veracity in the locality in which the witness resided.

In *State* v. *Shockley,* supra, we apparently have a reversal of the rule laid down in the Hite and Larsen Cases. It was there said:

"The testimony thus sought to be elicited in no way tended to prove any issue, fact, or circumstance in the case. Nor did it directly or remotely refer to any fact or circumstance testified to by him, or that came within the range of his examination in chief. We recognize the well-established rule that a defendant, when he takes the witness stand in his own behalf, may be cross-examined the same as any other witness. * * * And it is apparent that the questions were not asked, nor was the evidence sought to be elicited thereby, for the purpose of affecting his credibility as a witness or the weight of his testimony, but were evidently intended to prejudice him before the jury. * * *

"And while, as we have suggested, it is a matter that is almost entirely within the discretion of the court to what extent the cross-examination of a witness may be carried, yet the weight of authority holds that, when a party on trial for a criminal offense testifies in his own behalf, it is an abuse of discretion and is error to permit the state, over his objection, to interrogate him respecting the commission of other crimes by him which are in no way connected with the one for which he is being tried, unless the questions asked relate to some crime or crimes for which he has been convicted, in which case the questions are proper and may be asked. And even in cases of this kind the questions will be permitted for the purpose only of affecting the credibility of the defendant."

It will be observed that the opinion of Mr. Chief Justice Bartch, concurring in the result but dissenting from the above rule, quotes from a number of cases to the contrary and gives some idea of the conflict and confusion on this question in the various jurisdictions and among the cases in particular jurisdictions. It will also be observed that if the defendant is to be spared from such questions, so, logically, must all witnesses because by section 105-45-5, R. S. 1933, if the defendant offers himself as a witness he may be cross-examined by counsel for the state the same as any other witness. In order, therefore, to give the defendant the im-

munity declared for in the Shockley Case, it would be logically necessary to hold that no other witness could be so interrogated.

In *State* v. *Williams*, 36 Utah 273, 103 P. 250, the court held that the defendant, under prosecution for rape upon a little girl could not be, over general objections, cross-examined as to similar acts with other little girls. It thus followed the Shockley Case in principle but illustrated the need for sound discretion and common sense on the part of the trial judge. There an elderly man was tried for an offense against a little girl. The very accusation would raise revulsion in normal people and was likely in itself to prejudice the jury. He had been kind to many children, giving them small sums of money and gifts. If a kindness on former occasions were to be used to present intimations that he had been depraved, it added an almost irremediable prejudice against him. Yet, if a person tried for murder has been in one robbery or crime after another, it would certainly go to his credibility if he went on the stand for himself. As suggested above, the situation is further complicated by section 105-45-5, R. S. 1933, reading:

"If a defendant offers himself as a witness, he may be cross-examined by the counsel for the state the same as any other witness."

If a witness for the defendant is discredited by showing on cross-examination the commission of certain crimes, that may prejudice the jury against such witness and in that way affect the defendant's case, but if the defendant is thus cross-examined, it, in effect, amounts to more than prejudice. It practically puts him on trial for other offenses. And if he avoids answering by claiming his personal privilege, it carries to the jury an impression of admission. See *State* v. *Vance*, 38 Utah 1, at page 42, 110 P. 434. The logic of the situation, therefore, is that a rule must be laid down for witnesses which has in mind ample protection for the defendant, because he will be subject to the same rule thus laid down.

In *State* v. *Reese,* 43 Utah 447, 135 P. 270, we have a case where a witness for defendant, sitting in the back seat of the car with the sister of the prosecutrix who was in the front seat with the defendant, testified that he did not hear defendant make indecent proposals or indulge in improper conduct with the prosecutrix. On cross-examination he was asked whether he had not put his arm around the sister of the prosecutrix and he admitted he had done so. Unless this showed a motive through fellow-feeling to protect defendant, its only object could have been to degrade the witness's character for purposes of impeachment. There was hardly any likelihood that because the witness had placed his arm around the sister that he would be less likely to tell the truth about defendant. Any inclination to protect defendant because of friendship or because they were both in the same boat, would have been present just as much as if his arm had been strictly by his side. The Reese Case illustrates the apparent irrelevancy of such collateral conduct and the difficulty in drawing a line. It followed the rule in the Shockley Case which was in turn based on certain New York cases. But New York has seesawed like many other jurisdictions. *State* v. *Vance,* supra, deals at length with a severe and, we think, unwarranted criticism leveled at *State* v. *Shockley* by Professor Wigmore in his work on Evidence. The discussion by Mr. Justice Frick in the light of Professor Wigmore's criticism reveals the difficulty of the subject we are dealing with. The Vance Case did not touch on the precise point herein being considered.

In the second case of *State* v. *Williams,* 49 Utah 320, 163 P. 1104, 1106, the following question was asked:

"Well, now isn't it a fact Mr. Williams that there was some trouble at Marysvale in the latter part of the month of March when Mr. Mc-Cabe came to the residence of himself and Mrs. McCabe in Marysvale in the early morning when you and Mrs. McCabe were placed under arrest?"

Williams made defense on the ground that he thought the man who was pounding on the cabin door for admittance was Mr. McCabe, husband of the woman who was with him, and that the husband had come to kill him. Instead, it was an officer and he shot and killed the officer. The lower court overruled the objection to the quoted question. This court, on assignment of error, said:

"It is not contended by appellant that the questions complained of in any manner tended to degrade him, and had the witness done so he could have claimed his personal privilege, which he did not attempt to do either personally or by counsel. The state had a right to test the credibility of the defendant when he offered himself as a witness, and it was within the sound discretion of the trial court to determine whether the limits of his cross-examination was within the general rule and as has been repeatedly so held by this court."

It is rather difficult to see how this question in any way bore on the credibility of the witness. It would rather lead the reader to think that it was favorable to the defendant in that it showed a basis for the apprehension that if it was McCabe there would be trouble. Moreover, it does not seem unrelated to the incident which resulted in the shooting, and the ruling admitting it in testimony could have been sustained by this court under an entirely different theory. But it does recognize that the trial judge has a discretion.

In *State* v. *Thorne*, 39 Utah 208, at page 226, 117 P. 58, 65, it was said:

"But we think the prevailing rule is—though the authorities are not by any means harmonious—that for the purpose only of affecting credibility, the witness may not properly be asked questions relating to mere specific acts or conduct of a wrongful, culpable, or even incriminating character, not amounting to the commission of a crime, and which are separate and distinct from those on trial and not already voluntarily testified to by the witness. * * * Hence questions of that kind are regarded, not only as being irrelevant to the issue, but also as being irrelevant to affect credibility; *that is, to ask a witness if he had not committed burglary or murder, though irrelevant to the issue, is nevertheless relevant as affecting credibility.*" (Italics supplied.)

The italicized portion seems to imply the thought that he could be asked if he had not committed crimes involving moral turpitude in order to affect his credibility. In *State* v. *Johnson,* 76 Utah 84, 287 P. 909, 914, the same justice said:

"And there is judicial authority, *Ford* v. *State,* 106 Neb. 439, 184 N. W. 70, to the effect that a witness may not be cross-examined as to a plea of guilt in another case to affect credibility, since such does not show a conviction of a crime, but merely an arrest and a plea of guilty thereto, and that the entry of a plea of guilty without judgment or sentence is not a conviction."

It was held that a witness on cross-examination could not be asked whether he was arrested or charged or indicted for a crime, but that the inquiry must be as to conviction; and, although dicta, the opinion appears to state that a witness may not be asked whether he has pleaded ■ guilty to a crime, although in *State* v. *Thorne,* supra, it is held he may be asked whether he committed a certain felony. In short, these last two cases seem to hold that he cannot be asked whether he stated to the court in a plea of guilty that he committed the felony, but he can be asked whether he committed the felony subject to his privilege, and he can always be asked, not subject to privilege, whether he was convicted of a felony. We have some doubt as to whether such holdings can be logically harmonized. It should be noted that a witness may be impeached by properly showing he has been convicted of a felony even though he is not so asked on cross-examination.

To sum up, the law in this state was originally that a witness, whether defendant or not, could be asked on cross-examination as to any matter which would degrade his character and thus supposedly affect his credibility. Later it was held that it was "almost entirely within the discretion of the court to what extent the cross-examination of a witness may be carried," but that when a party testifies in his own behalf, "it is an abuse of discretion and is error * * *

to interrogate him respecting the commission of other crimes * * * unless the questions asked relate to some crime or crimes for which he has been convicted." *State* v. *Shockley,* supra. Then it was held that the witness could not be asked questions relating to "mere specific acts or conduct of a wrongful, culpable, or even incriminating character, not amounting to the commission of a crime." *State* v. *Thorne,* supra. But doubt was cast on this rule in *State* v. *Williams,* 49 Utah 320, 163 P. 1104, by the language which appears to hold that the witness can be asked such derogatory questions if he does not claim his privilege. And, lastly, in *State* v. *Johnson,* supra, it appears the witness may not be asked whether he has pleaded guilty to a crime like burglarly or robbery, but according to *State* v. *Thorne* may be asked whether he has committed it, subject to privilege. It is apparent that the law in this state needs clarifying. It would unnecessarily lengthen this opinion to comment upon the numerous cases in other jurisdictions which we have examined. Suffice it to say that in many of those jurisdictions there should be some judicial codification of court decisions.

The following principles, which we hope may aid in permitting the jury to know something about the reliability of the transmitter of the testimony, while at the same time protecting a witness against insinuations and useless degradation of character upon the general objection that such matters are irrelevant, without the witness having to give the impression of an admission by claiming his or her personal privilege, are here enumerated for the guidance of the bench and bar:

(1) Any witness may be asked on cross-examination whether he has been convicted of a felony.

(2) Any witness may be asked a question the answer to which has a direct tendency to degrade his or her character if it is pertinent to establish the ultimate fact in issue or to a fact from which such fact may be presumed or inferred.

(3) Questions whose only object could be to call for answers to affect the credibility of the witness and which answers could tend to degrade his or her character, but not tend to subject such witness to punishment for a felony, are permissible over a general objection as to their relevancy or competency, in the sound discretion of the court.

(4) Questions whose only object could be to call for an answer to affect the credibility of the witness and which would tend to subject such witness to punishment for a felony, are permissible over a general objection as to their relevancy or competency, in the sound discretion of the court.

(5) The discretion referred to in rules 3 and 4 is to be exercised in view of the varying circumstances of each particular case and not limited by the intrinsic and immediate considerations arising out of the cross-examination.

(6) Answers called for by questions specified under (3) and (4), if not excluded by the court in its discretion on general objection, are always subject to exclusion by the witness exercising his or her personal privilege, and this may be suggested to the court by the attorney. The court should, before the witness answers, inform the witness as to his or her rights in that regard.

(7) Guiding the discretion of the court, are the following: If the cross-examiner claims that he desires to show the witness as one of low morality or a dissolute person by a series of questions showing such facts, conduct or associations with disreputable characters as would tend to so stamp the witness as not worthy of credit, the court should in the absence of the jury take the offer of such questions and determine if it would so tend to show such character that the jury should have it as part of the case in order to judge of the credibility of the witness and, if so, permit in the presence of the jury such questions to be asked, sub-

ject to Rule (6). *People* v. *Morano*, 192 App. Div. 432, 183 N. Y. S. 483.

(8) Where the questions of the cross-examiner call for isolated or sporadic acts or conduct directly tending to degrade the witness, or show moral turpitude, whether they would tend to subject the witness to punishment for a felony or not, but which could not be said to mark the ▪ witness as one of low or dissolute character and which do not present any reasonable basis for an assumption that the witness was not telling the truth in the case, objection on the ground of irrelevancy and incompetency should be sustained.

(9) While a defendant in a criminal case who takes the stand may be cross-examined by counsel for the state, as any other witness (section 105-45-5, R. S. 1933), the matter of judicial discretion affecting all witnesses under the varying circumstances under which each may testify ▪ is not affected by such statute, and as elements in the exercise of such discretion, the court should consider the effect of questions in their tendency to prejudice the jury against the defendant or divert its attention from the main issue or issues of the case as weighed against the effect of such questions in affecting the credibility of the witness, keeping in mind that such questions as to a defendant may directly prejudice the jury in the case, whereas in case of a witness not a defendant they do no more than prejudice the jury against such witness and thus less directly affect the case. *State* v. *Williams*, 36 Utah 273, 103 P. 250; *State* v. *Vance*, supra; *State* v. *Shockley*, supra. But we think the matter should be left to the sound discretion of the court and do not intend to lay down any rule that under no circumstances can the defendant like any other witness be questioned as to his acts, criminal or otherwise, in accord with rule 7, which may tend to affect his credibility as a witness, subject always to the exercise of his personal privilege in proper cases.

(10) All of the above rules relate only to questions on cross-examination designed, not to show motive, or to explain, clarify, amplify, contradict, or directly destroy the force of any evidence brought out on direct examination, but only for the purpose of impairing the reliability of a witness as an honest, accurate and fair transmitter of testimony.

(11) The inquiry must end with the cross-examination, although not necessarily with the witness's answer to the particular question put. Thus, if one denies doing an act, a letter written by such person stating that he did the act could be shown him for the purpose of effecting a retraction of his answer. Whether, if he admitted writing the letter but refused to retract, the letter could be introduced as part of the cross-examination, does not now need to be decided.

The court in the instant case, under rules 3 and 7 above, might have been more liberal in permitting the defendant to show that Mrs. Miller was a woman whose character had suffered such deterioration as not to be a reliable vehicle for conveying evidence to the courtroom, but we fail to see how the defendant was really prejudiced. The only questions she did not answer were as to her using the name Howard in an affidavit (she had already denied she ever used the name Howard); as to living with Allen since the shooting; and whether she told Elva Carlson how the deceased got the money to provide for her. It does not appear that her telling some one how that money was procured would be good evidence of how it was procured. It was evidently an effort to further cross-examine her after her denial that she had "hustled." But, if so, the denial of the one was effective for the other, because had she not admitted the conversation with Elva Carlson, defendant could not have refuted her answer by putting that person on the stand according to rule 11 above. As to the other two questions, they would have a tendency to show the character of Mrs. Miller; especially the one regarding her living with Allen whom she met on the night of the shooting in the C-C

Restaurant, while she was living unmarried with Miller. But certainly, sufficient was shown in the evidence to reveal Mrs. Miller's character. It was shown she helped procure the bootleg whiskey; that she sat and drank with the strangers at least once out of the bottle; that she lived with Miller while unmarried to him; that he had been "floated" out of Los Angeles and she came with him hitchhiking; that Miller worked with a bootlegger in Los Angeles; that when Hougensen called across the street for Miller in order to get some liquor, she immediately came over, sat with the two men who wanted to get the liquor; that she went into the bedroom with one of them and Miller; that she was with the four men, Hougensen, Allen, Sheeley, and Miller, from 11 o'clock until about 3 in the morning and that about five or six pints of bootleg whiskey were consumed by them during that time. If the jury could not from this testimony get a fair idea of what type of woman she was, they must have been of such a caliber that all the other testimony proffered would not have had any effect. The jury evidently came to the conclusion that under all the circumstances manslaughter would about fit what Hougensen deserved under the testimony of Mrs. Miller and the defendant. We see no reason for reversing this case on the rulings of the court on the first seven assignments of error.

In assignments Nos. 8 to 13, inclusive, most of the questions in regard to which objection was taken and sustained and error assigned were for the purpose of bringing out facts about the character of the deceased. In so far as they were directed to Mrs. Miller on cross-examination, they might have shown her knowledge of the sort of character Miller was and thus indirectly show what sort of a woman she was to consort with such a man. But that would be permitting proof of the type of person Mrs. Miller was in too roundabout a way and, even under the rules above laid down, was certainly within the court's discretion to exclude them for that purpose. If we consider them for the purpose of showing that the deceased was a character

of low repute, the answer is that the dead man was not on trial. It is no less a crime legally to kill a person of low morality than one of the utmost probity, whatever difference there may be in its social results. Any questions which would tend to show Miller to be a quarrelsome or a violent or dangerous or easily provocable man would be material in the issue of self-defense, especially since the defendant was crippled. But the questions involved in assignments Nos. 8, 9, 12, and 13 were directed to show not such traits in the deceased but were as to his being an underworld character.

The question involved in assignment No. 10 comes nearer to the other class. Mrs. Chaffin was asked on cross-examination as follows: "Q. Did Mrs. Miller tell you, about the same time and at the same place, that Miller had beat up a man, breaking three ribs, and gave him up for dead because the man had 'peached' on him for stealing clothing?" But what Mrs. Miller had told Mrs. Chaffin about the deceased would hardly be competent to establish such a trait. There was no error in these rulings.

Assignments Nos. 14 and 15 complain of a failure of the court to include involuntary manslaughter as a lesser included offense in the instructions. There was no evidence to support any such instruction. The appellant's theory is that he had the right to order deceased from the restaurant; that if his doing it at the point of the gun was unlawful, then the killing occurred in the course of an unlawful act not amounting to a felony (the mere pointing of the gun not amounting to a felony). Or, if it was lawful to use a gun under the circumstances to compel an obstreperous person to leave, that the jury should have the right to say whether such lawful act was done in an "unlawful manner or without due caution or circumspection." But the whole transaction had completely passed beyond the matter of involuntary manslaughter when Hougensen intentionally shot the deceased. Then, either he had a right to do it in self-defense or he was guilty of murder or voluntary manslaughter. If a man pulls a safe to the third floor

over the street and does it in such a grossly negligent manner that it kills some one, that may be involuntary manslaughter because it is lawful to take a safe through the window of this third story, but it being done so bunglesomely may amount to manslaughter. But if he deliberately cuts the rope to let the safe fall on a pedestrian, the question of involuntary manslaughter disappears from the transaction. There appears almost an element of unconscious humor in the argument that intentionally pulling the trigger of a gun leveled at a man is the doing of a lawful act of pointing the gun (to get him to leave) in an unlawful manner. There was no error in not including an instruction that defendant might be found guilty of involuntary manslaughter.

By assignment No. 16 defendant claims error in giving instructions Nos. 25, 26, 27, and 29, and by assignment No. 17 he claims error in not giving defendant's requested instructions Nos. 14, 23, and 34. Instructions Nos. 25 and 26 were to the effect that if it appeared beyond a reasonable doubt that Hougensen formed a design to kill or do great bodily injury to Miller, that it would nevertheless be first-degree murder if Hougensen provoked a quarrel as a blind for doing the injury. We find no evidence either under Mrs. Miller's or Hougensen's testimony which would reasonably support any such theory. Perhaps if Mrs. Miller's and Hougensen's testimony were each believed in part, by some stretch of the imagination such a situation could be made out. It is not necessary to determine this because we do not think either instruction prejudicial. Had defendant been convicted of first-degree murder, they might have been quite prejudicial. If there was no such evidence, the jury might have, because of such instructions, strained the evidence to include such consideration on the theory that there must be evidence of such design or they would not have been thus instructed. But when the jury found defendant guilty of manslaughter, certainly it dismissed the idea that he was guilty of first-degree murder by provoking a quarrel in order to vent his malice. It could

hardly be said that it caused them to compromise on a plane more unfavorable to him than they otherwise would have done. It is difficult to visualize a mental process which would conclude that a man was killed with malice afore-thought, whether under a built-up preliminary of pretended self-defense or otherwise, and then deliberately ignore that conclusion and render a verdict of manslaughter. If there was any compromise, it was because the jurors were in very grave doubt as to whether there was a deliberate premedi-tated killing, but thought Hougensen not free from fault in using a gun under the final circumstances of the shooting, but Miller himself very provocative.

We find no error in instruction No. 27, which was to the effect that there was no issue as to defense of habitation, but only self-defense. True it may be, as contended by defendant, that while a person may be tacitly invited to enter the premises of another, circumstances may ██ arise thereafter which would justify defense of abode. But we find no evidence showing that defendant was de-fending his abode, but only evidence that he was defending himself. He had no family living there. He lived there alone and there was no evidence that Miller was attempting to prevent defendant from entering any part of the premises or that defendant shot to prevent defendant from entering any part of the premises. We see no error in instruction No. 29 and, indeed, none is pointed out to us. We conclude, therefore, that assignment No. 16 is not well taken.

Assignment No. 17 deals with the failure of the court to give defendant's requested instructions Nos. 14, 23, and 34. Wherein the error lay in refusing these instructions has not been pointed out to us. The record reveals no exception to the refusal to give requested instruction No. 34. From a casual reading of defendant's requested in-struction No. 14, which is all it deserves under the practical abandonment by defendant, we find no error in re-fusing it. The matter requested by defendant's requested in-struction No. 23 appears to have been fully and adequately

covered by the court's instructions. We conclude, therefore, that assignment No. 17 is not well taken.

We conclude finally that the judgment of the lower court must be affirmed. Such is the order.

ELIAS HANSEN, C. J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.