STATE v. MURPHY.

No. 5791.   Decided May 12, 1937.   (68. P. [2d] 188.)

384

Karl V. King, of Salt Lake City, for appellant.

Joseph Chez, Atty. Gen., and Zelph S. Calder, Deputy Atty. Gen., for the State.

HANSON, Justice.

Defendant was convicted of murder in the first degree and sentenced to life imprisonment at hard labor. In his appeal to this court the defendant does not attack the sufficiency of the evidence to sustain the jury's verdict. His assignments of error deal only with certain alleged misconduct of the district attorney during the trial and with alleged errors in the rulings of the court on questions of evidence. We deem it unnecessary, therefore, to recount the details of the unfortunate occurrence and shall refer to the evidence only as it is necessary to dispose of the assigned errors.

Defendant charges that substantial prejudice resulted to the defendant in the trial court's failure to restrain counsel for the state and defendant alike in making prejudicial statements and arguments in the jury's presence, their persistent arguing preventing a fair trial. It is further urged that the court erred in permitting the district attorney to repeatedly interrupt defense counsel and comment on and interpret the meaning of the evidence. Certain statements of the prosecuting attorney, hereafter quoted, are made the subject of separate assignments of error. Defendant also claims generally, without pointing out any specific instances, that the statements and comments of the state's attorney, taken as a whole, were of a nature and were of such frequency as to destroy the jury's ability to keep the main issues in mind.

The specific charges of misconduct on the part of the prosecuting attorney relate to statements made by him during the cross-examination of Mrs. Norman, the wife of the

slain man. Mrs. Norman was called as a witness for the state and related what she knew of the circumstances leading to the fatal shooting. On cross-examination defense counsel examined her relative to discrepancies between her testimony on direct examination and the testimony she had previously given at the preliminary hearing. She and her husband occupied an apartment in one of the local hotels. They were friends of a Mr. Morgan, a plain clothes officer of the Salt Lake City police force. On the day of the fatal shooting, Mr. Morgan and defendant came to the apartment occupied by the Normans. A bellboy was summoned to obtain liquor for them. Some argument arose as to who should pay for the liquor, and defendant used obscene language in the hearing and presence of Mrs. Norman. Mr. Norman told defendant he could not use such language and would have to leave. Defendant refused to leave, and Mr. Norman went over to him and took hold of him to get him out. It was then that defendant shot him. During all of this time Mrs. Norman was lying on a bed in the room, as she had been ill for several days. Defense counsel, on cross-examination, sought to have her tell the position of Mr. Norman in the room immediately prior to his going over to defendant. The witness apparently became somewhat confused in the course of this cross-examination. Defense counsel then addressed the following statement and question to the witness: "Now, you practically have me dizzy, Mrs. Norman, in this matter, because if Mr. Norman went down at this writing desk, and you were lying here did Mr. Norman walk backwards up to this chair?" The district attorney objected to the use of the word "dizzy" and the inference that her testimony was incorrect. The court struck the word "dizzy" and admonished the witness to listen carefully to the questions. The following statements of counsel were then made:

"District Attorney: We are not having trouble with the witness in this regard. If he will ask questions in a way she can understand them, she will have no hesitancy in answering.

"Defense Counsel: I simply want to apologize for my hapless and hopeless predicament.

"District Attorney: I have no feelings towards you, but this girl has gone through considerable trouble, I imagine this is her first experience. She is worried and discouraged.

"Defense Counsel: Well, I have no doubt of that, and I will be just as gentle and fair with her as possible. That is exactly what I am trying to do."

On her direct examination Mrs. Norman had testified that the bellboy came to the room twice, once in response to the original call and again when he returned with the liquor. On cross-examination defense counsel referred to and read from her testimony at the preliminary hearing as follows:

"Q. At the preliminary examination Mrs. Norman, I asked you this question: 'Shortly after Mr. Murphy started using obscene language and Mr. Norman started arguing with Mr. Murphy and said "I don't want you to use that language in front of my wife," ' was the bell boy there? Did you answer 'he was still there.'? And when I asked you this question: 'Had he left before Mr. Norman started physically to eject Mr. Murphy from the room' and you answered that 'Yes.' Now was that correct? A. No sir.

"Q. Well, there wasn't very much of your testimony at the preliminary hearing that was correct, was there?"

The court sustained the objection to the last-quoted question, and defense counsel asked:

"Well, you made a number of mistakes in your testimony at the preliminary hearing, didn't you?"

This was objected to as calling for her conclusion, the district attorney commenting as follows:

"If her statements weren't correct at that time she was confused as to the number of times the bell boy was there, and if she recollected at that time he was there only once, her testimony would have been absolutely correct as read to her by Judge Rogers (defendant's counsel)."

Defense counsel replied:

"I don't want to go through the whole transcript. If counsel wants me to go through all of her testimony, I will be glad to do so."

The district attorney then stated:

"I have no objection to it because at that time she indicated—she testified at that time, ten days after this thing happened, she was in shock and nervous, and if he desires to go through the whole transcript, I won't object to it."

The court observed:

"There is no objection to going through any testimony you wish only I think perhaps the jury should draw its own conclusions as to whether or not she made mistakes in her preliminary testimony, or not."

When the cross-examination was resumed, the witness admitted that she had been mistaken in three particulars testified to in her preliminary examination. Prior to the time defense counsel read her previous testimony, above quoted, she had testified on cross-examination that at the preliminary hearing she was upset and her recollection of some of the events occurring at the time of the shooting was not as clear as it was at the trial.

On redirect examination the district attorney read from her testimony given at the preliminary hearing and asked her if she recalled giving said testimony. Defense counsel objected to the question as being improper redirect examination, incompetent, irrelevant, and immaterial. The district attorney, in support of his question, argued as follows:

"Judge Rogers, at some length questioned this witness as to what was said at this preliminary examination and examined her regarding it, but did not examine her relative to other parts. Then after her testimony he said to her: 'Now there is a discrepancy in your testimony there, is there not,' and I think I have a right to refresh her memory by calling her attention to what was asked her and what she testified to there, so that it will show to this jury, and I think they are entitled to get this evidence, that there was no discrepancy, but that her testimony was exactly as it is now, in substance."

The court overruled the objection, saying that "the redirect examination is to enable the witness to make any explanation she might desire to make."

We have made the above extended statement from the record for the reason that the statements of the district attorney therein contained are the only statements to which our attention has been called specifically as being improper and they, necessarily, must be considered in passing upon the general charge that the record as a whole, as well as these specific statements, show misconduct.

While the district attorney represents the people and is under obligation to protect society by prosecuting those who are brought to trial with vigor and earnestness, he also owes to the defendant in every case the duty to be fair in the conduct of the trial and in the use of evidence. It naturally follows that the defendant can complain of the conduct of the prosecuting officer only when it is apparent that this duty has been violated, that is, when the defendant's right to a fair trial has been prejudicially invaded by such conduct. *People* v. *Willard,* 150 Cal. 543, 89 P. 124; *People* v. *Rosenthal,* 139 Cal. App. 42, 33 P. (2d) 864.

Counsel for both the state and the defendant have the right, within proper bounds, to interpose objections to questions asked and to the admission of evidence. They likewise have the right to express their reasons for making such objections, but in this connection they should not include their interpretations of the testimony beyond the point necessary to give understanding to their reasons. It is largely a matter of good faith. Under the guise of stating reasons, a witness may be coached or the jury may be propagandized by counsel. Sometimes this is done so adroitly and insidiously that it is difficult for the court to separate that which is necessary to illuminate counsel's position from that which is intended to coach a witness or to influence the jury. But it must be remembered that trials cannot be made mathematical or governed by exact patterns.

The human element looms very large. Two trials over exactly the same issues between the same parties will vary greatly depending on counsel. Some latitude must be given to the personal element.

The record before us contains considerable argument of counsel for both sides, relating to the admissibility of evidence and objections to questions asked. But there is nothing to indicate that such arguments were unfair, were dishonestly made, or were, not, in the main, pertinent to the issue under discussion. While we think the statement of the district attorney that Mrs. Norman "is worried and discouraged" might well have been left unsaid, still we cannot see how such statement can be said to be an attempt by the district attorney to take any unfair advantage of the defendant or to influence the jury in any unfair manner. She was there in the presence of the jury; they knew she was the widow of the slain man and that she had "gone through considerable trouble." The remark may be explained with more propriety as a natural solicitude for the witness in which defense counsel himself joined. Nor do we think that the record, above quoted, covering her cross-examination concerning her testimony at the preliminary hearing, shows a prejudicial invasion of defendant's right to a fair trial. Mrs. Norman had already testified on cross-examination that she was upset at the time she testified at the preliminary hearing and that her recollection then was not as good in reference to some matters as it was at the trial. The district attorney's statement simply referred to this testimony. His other statement was an expression of his understanding of the effect of her testimony at the preliminary hearing. While it does appear that the statements of the district attorney were somewhat beside the question raised by his objection to the question asked, we cannot see wherein they were prejudicial to the defendant or wherein they could have an improper influence upon the jury. There is nothing in the record to indicate that the difference between her testimony at the preliminary hear-

ing and at the trial, assuming there was a difference, could not, by legitimate inference, be ascribed to her confusion rather than to some other reason that would reflect more seriously upon her credibility.

The statement of the district attorney in answer to the objection of defense counsel to his reading to the witness certain of her testimony given at the preliminary hearing constitutes a statement of the reason why such reading was permissible. His rather positive language that there was no discrepancy between her present and former testimony was a conclusion, arising, no doubt, from his recollection of what her former testimony was. The purpose of the testimony offered was to show there was no discrepancy and a statement of such purpose would constitute a statement of the reason it was thought admissible. To that extent, at least, there would be no impropriety in the remark of counsel. While it was for the jury, in weighing her evidence, to decide whether there was a discrepancy or not, and while the statement did exceed a statement of mere purpose and contained a conclusion of counsel, we do not feel justified in holding that there was such prejudicial misconduct as would require us to remand the case for a new trial. See *State* v. *Starvos,* 69 Utah 181, 253 P. 204. After careful consideration of the whole record, we feel constrained to overrule defendant's charge of misconduct on the part of the prosecuting attorney.

During the cross-examination of Mrs. Norman, defendant offered to show by cross-examining her that she and Mr. Norman had visited Mr. Morgan the day before the homicide was committed; that defendant had joined them and they drank liquor together in a friendly manner; that the Normans extended a general invitation to defendant to visit them at their apartment in the hotel. The court rejected the offer as not being proper cross-examination. The court's ruling is assigned as error. It may be conceded, and the trial court did so concede, that the proposed testimony would have some materiality upon the question of malice and

premeditation. The only question involved is whether this testimony could be elicited as a matter of right on cross-examination.

On her direct examination Mrs. Norman simply related what occurred at her apartment at the time her husband was killed. She gave no testimony at all as to what occurred the day before. Her testimony on direct examination may be summarized as follows: About noon on March 4, 1935, Mr. Morgan and defendant came to the hotel apartment occupied by the witness and her husband. When they came in Mr. Norman greeted them by saying: "Hello, Jack." Defendant sat in an arm chair. Mr. Morgan took off his gun holster, containing his gun, and laid it on the dresser. Mrs. Norman asked that the gun be put out of her sight. Defendant got up, put the gun in his pocket, and returned to the chair. Mrs. Norman was lying on the bed during all this time. Mr. Norman asked if they brought something to drink. Mr. Morgan said, "No," and suggested calling for some. Mr. Norman called the bellboy (Mitchell) on the phone. Mitchell came in but refused to get the liquor unless he was given the money for it. Defendant became angry and used violent language towards Mitchell. Norman assured Mitchell the liquor would be paid for. When Mitchell left Norman told defendant he would not stand for the language which defendant had used before Mrs. Norman and that if he talked as he did he would have to leave. Defendant refused to leave and Norman went over to him and took him by the shoulders to help him out. Immediately thereafter the witness heard two reports of a gun and Norman exclaimed: "My God, he got me." The witness first realized what had happened when Norman plunged towards the bathroom and fell inside. She ran out of the room for help and on her return a doctor told her Mr. Norman was dead.

Section 105-45-2, R. S. 1933, provides that the "rules of evidence in civil actions shall be applicable also to criminal actions, except as otherwise provided in this act." Under this section the scope of the cross-examination of witnesses

in criminal actions would be governed by the same rules as apply in civil actions. In the case of *State* v. *Vance*, 38 Utah 1, 110 P. 434, 445, this court held that in the cross-examination of the accused as a witness the same rules apply as would be applicable to any other witnesses and that the cross-examination must be limited to the subject-matter gone into by the witness in his testimony in chief, stating that whatever would contradict, modify, explain or make clearer, limit or enlarge the facts testified to on direct examination would be proper on cross-examination. The court says further that when a witness "merely states what occurred at a particular time and place, then what took place at such time and place ordinarily constitutes the subject-matter upon which the witness testified, and the cross-examination should be limited to that subject."

In *Anderson* v. *Salt Lake & O. Ry Co.*, 35 Utah 509, 101 P. 579, 581, this court, in speaking on the same subject says:

"In other words, all matters that may modify, explain, contradict, rebut, or make clear the facts testified to in chief by the witness may be gone into on cross-examination. Ordinarily, when this field has been covered by the cross-examiner, the right, as an abstract right, to further cross-examine ceases. Beyond this the matter of cross-examination necessarily, to a very large extent at least, must be left to the sound discretion of the trial court."

We cannot see how the cross-examination proposed, covering what occurred the day previously, could be calculated to "contradict, modify, explain, or make more clear and intelligible" anything said by this witness on her direct examination heretofore summarized. Under such conditions further cross-examination was a matter within the discretion of the trial court, and, in the language of this court in the case last above referred to, "reviewing courts ought to be very careful, and should hesitate long before reversing judgments upon the ground that the trial court either restricted or enlarged the scope of cross-examination." We are

of the opinion that the record here before us does not disclose such abuse of discretion vested in the trial court as to compel a reversal upon the ground asserted. The following cases sustain the conclusion thus reached: *State* v. *Smailes,* 51 Idaho 321, 5 P. (2d) 540; *Commonwealth* v. *Fencez,* 226 Pa. 114, 75 A. 19; *Poston* v. *State,* 83 Neb. 240, 119 N. W. 520; *Cook* v. *State,* 162 Ark. 205, 258 S. W. 136; *State* v. *Inich,* 55 Mont. 1, 173 P. 230.

In cross-examination of Mr. Yeates, a witness for the state, who was in the bathroom at the time the homicide was committed, defense counsel asked the following question:

"Mr. Yeates, for some time you have been completely out of funds,—haven't you?"

This was objected to as being immaterial and irrelevant. Defense counsel then made the following statement privately to the court:

"I offer to prove by the cross examination of the witness Yeates, that he has been out of funds ever since the time of this homicide; that after the homicide he stated that he heard no conversation, quarrel or argument between Norman and Murphy, and he now states he did hear a conversation or quarrel, and that he has changed his testimony simply to earn a witness fee."

No ruling by the court in this offer is shown by the record. It does not appear that defense counsel was denied the right to examine along the lines indicated or whether he simply abandoned such examination. It is argued that the proposed examination was directed to show the witness' interest in the prosecution. If he had made statements contrary to what he testified to on direct examination, it would be proper to cross-examine him in respect to such statements for the purpose of eliciting an admission or laying the foundation for impeachment. On this matter defense counsel had previously examined the witness who denied stating that he had not heard the conversation between Norman and defendant. It does not appear that counsel was in any wise

restricted in his cross-examination on that particular matter. Moreover, it does not appear in what manner such contradictory statements could have any relationship to his being out of funds, except to accept counsel's version that he was changing his testimony to earn a witness fee.

There is nothing in the record to indicate that the witness' testimony on cross-examination would have been as stated by counsel. It might be assumed that he would be paid the fees prescribed by statute, but certainly it cannot be assumed that he would admit having committed perjury to obtain such a sum of money as would be paid as witness fees. The matter sought to be elicited was such as would cast serious reflection upon the witness, and, so far as the record discloses, without apparent cause and without any showing of a well founded belief either that the witness was changing his testimony or that he was changing it to earn a fee. No attempt was made to supply a reasonable basis for such examination. The court was fully justified, therefore, in refusing defendant the right to cross-examine as proposed; assuming that the court did so refuse, on which point the record is not clear as above indicated. See *Chapman* v. *Rose*, 135 Wash. 248, 237 P. 708.

Error is assigned in the refusal of the court to strike certain testimony given by Thomas Mullaly, a witness for the state. This assignment of error is not argued in appellant's brief, and will be considered as having been waived. *State* v. *Hanna,* 81 Utah 583, 21 P. (2d) 537.

In the cross-examination of the defendant the district attorney was permitted, over objection, to ask whether his right name was James Murphy; whether he had ever gone by the name of James Edgar and had given that name to the Salt Lake City Police Department; whether he had gone by the name of James Paul Wilson and whether that was his correct name. This is assigned as error. It is contended that the asking of these questions was calculated to create the inference that defendant was of bad

character because he had gone under several aliases. He denied having used any of the aliases other than James Paul Wilson and admitted that this was not his correct name. His correct name was a material matter. On direct examination he had testified that his name was James Murphy. We think the fact that defendant has employed different aliases is a proper subject for cross-examination. If he admits that he assumed such names, it is always proper for him to make an explanation. The use of such assumed names, if not satisfactorily explained, goes to the credibility of the witness.

On cross-examination defendant was asked concerning the nature, place, and extent of his employment covering several years prior to the time of the homicide. It is argued that this should not have been permitted as it was an attempt to show that he had not done an honest day's work and was spending his time in cheap hotels. The record does not show that any objection was made to this cross-examination. It is not necessary, therefore, for us to express any opinion as to whether this was proper cross-examination or not as objections to evidence admitted cannot be urged for the first time on appeal.

On his direct examination defendant testified that he was with Morgan the day before the homicide and went with him to a funeral; that on the way to the funeral they stopped to phone; that just prior to this Morgan, who was intoxicated and ill, threatened to shoot himself; that defendant was afraid he would carry out his threat. That evening defendant took Morgan's gun and returned it later the same evening. When he returned the gun there were no cartridges in it. On cross-examination he testified he picked the gun up and put it under his belt. He was asked if it wouldn't have been easier to carry it in his pocket and why he didn't put it in his pocket. It is claimed that the court erred in overruling defendant's objections to these questions. The first question was not answered at all. Defendant answered the second question by saying that he didn't put the gun in his pocket because he put it under his

belt. We think the prosecution was within the bounds of proper cross-examination in asking the question. The defendant had testified on direct examination that he had put the gun under his belt. The defense was that the gun fell to the floor accidentally and went off. The state's evidence was to the effect that the defendant put the gun in his left-hand coat pocket. We perceive no error in the action of the court in overruling defendant's objection to said questions.

On direct examination defendant testified that after Morgan had laid the revolver on the dresser in the Normans' hotel apartment and Mrs. Norman said she wished some one would take the gun and move it, defendant picked it up and put it under his belt and sat down again. Later when he rose to use the telephone, the gun dropped out and fell into the chair. He reached back to pick it up and as he straightened up it discharged. Then Norman grabbed hold of the revolver and bumped against defendant and the revolver discharged the second time. Norman grabbed his stomach and staggered across the room and fell backwards into the bathroom.

The effect of this testimony was to show an unintentional if not an accidental shooting. On cross-examination defendant was asked, over objection, the following questions:

"On November 10, 1931, you had one (a gun) in your possession, didn't you? Well, would you say that you did not have a gun in your possession on November 10, 1931? August 30, 1933, in Denver, Colorado, did you have a gun in your possession? Why didn't you put it (the gun) in your pocket? Have you, on many occasions, carried a gun in your belt on your left hand side?"

It seems clear to us that these questions were all proper on cross-examination and material. He had testified on direct examination that the gun discharged first when he attempted to pick it up. Certainly his experience and familiarity with guns, within proper limits, was properly a matter of inquiry to test the credibility of this testimony. The likelihood of an accidental discharging of a gun while being

picked up from a chair into which it had fallen certainly would not be as great with a person familiar with the handling of guns as with a person unfamiliar therewith. The other questions concerning his reason for not putting the gun in his pocket and whether he had frequently carried a gun under his belt were proper on cross-examination, involving, as they did, matters testified to on direct examination and being calculated to test his credibility.

There being no reversible error shown, the judgment of conviction appealed from is hereby affirmed.

FOLLAND, C. J., and MOFFAT and LARSON, JJ., concur.

WOLFE, Justice (concurring).

I think we have perhaps given undue attention to the assignments of error 1 to 5, inclusive. It is obvious from the record that the prosecuting and defense counsel, a former prosecuting attorney, both pre-eminently able to handle themselves in the trial of cases, asked and gave no quarter. The fact that there were exchanges and sallies between them, that there was loaded onto the arguments made to the court some remarks by both which appear to go beyond those necessary to support the arguments and which were mayhaps intended to carry over to the jury, does not present sufficient in this case upon which to ground prejudicial error. By this I do not mean to go on record as holding that there may not be types of remarks which in certain cases might justify reversal. This is not one of them. As compared with the larger and predominating aspects of the case, the matters complained of are comparatively trivial. As to the other assignments of error, I think what has been said in the opinion and in the case of *State* v. *Hougensen,* 91 Utah 351, 64 P. (2d) 229, lays down the law applicable to these assignments.