STANLEY B. McGILL, RESPONDENT, v. WALNUT REALTY COMPANY, A CORPORATION, APPELLANT.—148 S. W. (2d) 131.

Kansas City Court of Appeals. January 27, 1941.

*Ira B. Burns* and *John A. McGuire* for respondent.

876

*Bowersock, Fizzell & Rhodes* for appellant.

SPERRY, C.—This is a suit for damages for alleged false arrest and imprisonment. Plaintiff was Stanley B. McGill and defendant was Walnut Realty Company, a Corporation. Judgment was for plaintiff and defendant appeals.

Defendant's first complaint is that its demurrer to the evidence should have been sustained, because, it says, the evidence failed to establish that defendant's agent "caused, instigated or encouraged" plaintiff's arrest. In this connection defendant claims that the evidence on behalf of plaintiff was wholly circumstantial and that it failed to establish the ultimate fact, claimed by plaintiff, so conclusively as to eliminate every other reasonable hypothesis. This is the rule governing circumstantial evidence in civil cases. [Fritz et al. v. St. Louis, Iron Mountain & Southern Railway Co., 243 Mo. 62, 77, 148 S. W. 74.]

Because of the challenge of the sufficiency of the evidence we shall here set out fully such evidence as bears on the question of defendant's instigation of plaintiff's arrest. In doing so we will accept as true all evidence of plaintiff that tends to prove his cause of action, draw all reasonable inferences to be derived therefrom, and view the whole matter in the light most favorable to the cause of action. [Peterson v. Fleming, 222 Mo. App. 296.] We will disregard defendant's evidence tending to prove facts contrary to those which the evidence of plaintiff tended to establish. [Willhauck v. Chicago R. I. & P. Ry. Company, 332 Mo. 1165, 61 S. W. (2d) 336, 337.]

Plaintiff, at the time of this arrest, was a married man, of good reputation, and was employed by the Henrici-Lowry Engineering Company, a highly respected firm of Kansas City. He was a graduate civil engineer and had never been arrested prior to the occurrence herein complained of. Defendant was the owner of the Fidelity National Bank Building in Kansas City. A strike of building employees had been, and then was in progress in said building. There had been much violence offered to defendant's employees outside of the buildings, and stench bombs had been placed in the building during the course of the strike. As a result of these conditions defendant had arranged for its employees to remain, at all times, within the building, and had requested the Kansas City Police Department to furnish police protection, which was being done. Two policemen were kept constantly stationed in the main lobby of the building, near the elevator. These policemen were relieved every eight hours and others took their places. The police guard was under the supervision of two lieutenants of the police department, Hansen and Reddich, who alternated in making inspection tours to the building. Defendant's employee, Ulmer, was superintendent of the building and was charged with the duty of supervising the various building employees and of grading the building. He had an office in the subbasement where were located the engines, pumps, tanks, switches, etc., that operated the water, lighting, sewage and elevator services of the building. Ulmer had no power to issue passes to people coming to inspect the building. Defendant's employee, Alves, was building manager. He had an office on a higher floor. One desiring

to inspect the building was required to first secure a pass from him. The building was open to the public and people were coming and going as usual. The elevators were running. Pickets were walking in front of the building and two police officers were stationed in the lobby. Those were the conditions existing on September 30, 1937.

Plaintiff was not aware that a strike was in progress and, at about 2 P. M., on September 30, 1937, he entered the lobby of the building. The firm for which he worked had under consideration the question of recommending to a client the purchase of sewage pumps of a particular type. A salesman for the company handling said pumps had informed plaintiff that there was a highly successful installation of these pumps in defendant's building and suggested that he inspect same. It was for that purpose that plaintiff entered the building. He saw a uniformed person, probably one of the policemen, near the elevators, and stated his errand to him. The officer referred him to defendant's employee, Ulmer, who was then in the lobby. Plaintiff testified as follows concerning subsequent conversations and events:

"I said, 'My name is McGill. I am with the Henrici-Lowry Engineering Company and a salesman by the name of Fithian tells me you have a very nice pump installation here and I thought you would allow me to see it and perhaps tell me something about your experience with it.'"

"He said, 'Well, why do you come particularly to see our pumps?'"

"Well, I stated that the salesman had told me that it was a very desirable installation to see and it was one of the newer types of pumps and for that reason I was particularly interested in seeing it.

"He asked me once more what firm I was with and I repeated that and then he took me very firmly by the arm and we walked up to the front of the lobby. He said, 'Come with me.' He said, 'I will take you to the man you want to see.' We went to the front of the lobby and we then turned into the telegraph office." . . .

"Yes, near the front of the lobby and we came face to face with a policeman. Mr. Ulmer and the policeman had a conversation lasting a few minutes, whispered conversation, which I didn't pay any attention to. I was standing a few paces away.

"Q. Did you hear anything they said in that whispered conversation? A. No, not in the whispered conversation, but as he turned to me Mr. Ulmer said to the policeman, 'take charge of him.'

"Q. How long did they talk together in that whispered conversation? A. Oh, I would judge about two minutes.

"Q. Then Mr. Ulmer said, 'Take charge of him' to whom, as he turned to leave? A. Well, he turned to me and he said, 'You stay here.'

"Q. Then what happened? A. Well, Ulmer left and I stood there for a while, chatted in a general way with the policeman. After

waiting a while I remarked it seemed as if Ulmer was being a long time and perhaps they were busy, I had better come back some other time. The policeman then told me to sit down in a chair, which was nearby, and he probably would be back soon, that Ulmer would probably be back soon, so I sat down and waited another five minutes, probably, and then I stood up and said to the policeman that I had some other matters to attend to and I didn't believe I could wait any longer. The policeman told me that I would have to wait, that I could not leave and after some protest on my part and a remark I couldn't understand what he was talking about, he said to me, 'You don't realize the serious position that you are in.' After he said that I didn't say anything further for a moment or two. It was just that I was so astonished that I didn't say anything further for a while, then I began searching in my pockets for something to identify myself with. I thought, naturally, he must have been mistaken, somebody must have mistaken me for someone else.

"Q. What did you have in your pockets? A. I had a bank book showing that I was a depositor in the Union National Bank and I thought that the teller could identify me.

"Q. Did you show the bank book to the policeman? A. Yes, I showed it to the policeman and he glanced at it but he didn't take it in his hands or didn't pay any attention to it particularly.

"Q. Did you show him anything else? A. I showed him my cards, my library cards, one of my wife's and one of my own, both of which have our name and address on them.

"Q. Anything else you showed him at that time? A. He paid no attention to those. I don't think I went any further with him in showing them but I continued to ask him to let me identify myself with the teller by means of the bank book.

"Q. The teller there in the bank? A. Yes, in the same building.

"Q. Yes. A. I continued to protest and possibly I got a little bit noisy and began to attract a little attention, people began to look around to see what was occurring. The officer then told me to pipe down and be quiet. He said that I was in his charge and he was waiting for officers to come and get me.

"Q. Did anything else occur before any other officer came? A. No.

"Q. How long was it from the time you first were placed in charge of this officer until some officers came? A. From twenty to twenty-five minutes.

"Q. And where were you during all of that time? A. Standing right near, in the lobby, near the entrance to the telegraph office.

"Q. And where was this police officer during that time, that twenty or twenty-five minues? A. Right beside me.

"Q. Did he leave you at all? A. No.

"Q. Did he phone? A. No, he didn't.

"Q. Did you see Mr. Ulmer any during the time after he left there, before you left with these officers, before you left the telegraph office? Did you see him again? A. No.

"Q. Now, did any other officers come? A. Yes.

"Q. About when was that, would you say? A. In about twenty or twenty-five minutes.

"Q. Uniformed officers or plain clothes men? A. No, plain clothes men.

"Q. Do you know who they were? A. I learned later one man's name was Hanson.

"Q. Then what happened? A. He said, 'What have we here?' I didn't answer; no one answered and then the officer in uniform said: 'You can answer his question, he is my boss.'

"Q. Tell what happened. A. Hanson then went on and questioned me.

"Q. What did he ask you? A. He asked me what I was doing there, who I was, why I came there and I answered all of those questions, stated my name, who I was and that I had come there to get permission to see the sewage pumps.

"Q. Then what happened after you had been in there about ten minutes? A. We stepped outside the door. Mr. Hanson had me stand there beside him.

"Q. Was that in the lobby of the building? A. Yes, at the corner, where you make the turn when you are entering the building to get to the rear of the lobby, then you turn to go in front of the elevators. It was in that corner where the turn was.

"Q. How long did you stand there? A. Oh, five or ten minutes.

"Q. Then what happened? A. During the time we stood there?

"Q. Yes. A. During the time we were standing there, Chris Ulmer passed by and I called to him.

"Q. What did you call to him? A. I asked him if he wouldn't come over there and tell me what the trouble was, trying to get the thing straightened out.

"Q. Did you know, up until that time, what the trouble was? A. I had no idea.

"Q. Did anybody tell you what was the trouble? A. No.

"Q. When you called to Chris Ulmer, as he walked by there in that lobby, what did he do or say? A. He glanced briefly in my direction and walked right on by; he said nothing. I then appealed to Mr. Hanson if he wouldn't make an effort to get him on over, if he wouldn't take me over there. I got no response.

"Q. What did the officer do with you? He took me and put me in this patrol car.

"Q. Was he alone or was there any other officer with him? A. There were two officers in the car."

The above testimony discloses that plaintiff entered the building, which was open to the public, unaware that a strike was in progress, a free man bent on a lawful mission; that he clearly stated his mission to defendant's employee, Ulmer; that defendant's employee took him firmly by the arm and told him: "Come with me. I will take you to the man you want to see;" that he led him to a policeman whom plaintiff had never seen; that he held a whispered conversation with the policeman and then said to the policeman: "Take charge of him," and to plaintiff he said: "You stay here;" and that the policeman immediately, without any intervening information, instruction, or act on the part of any one, placed plaintiff under arrest.

We cannot agree with defendant's contention that the evidence of defendant's agency in causing the arrest is wholly circumstantial. The evidence indicates that the arrest was ordered by Ulmer who told the policeman to "take charge of him." There is no evidence to the effect that the policeman had any information of any kind, concerning plaintiff, upon which to act excepting such as he may have received in the whispered conversation with Ulmer (if he received any from him), and Ulmer's order that the policeman "take charge of him." We think that there was substantial evidence tending to prove that the arrest was made solely at the instigation of defendant's agent. The court so held in Oliver v. Kessler, 95 S. W. (2d) 1226, 1227, 1228, where defendant said: "Take him on officer, take him on officer." See also Pandjiris v. Hartman, 94 S. W. 270, 196 Mo. 539, where defendant "ordered the officer to do his duty." Ulmer later saw plaintiff in custody and refused to intercede or to inquire the cause of his arrest. The jury could infer, from his action in this respect, that he knew the officer had carried out instructions to "take charge of him," and that Ulmer was indifferent as to what might thereafter occur.

We think the evidence in this case falls within the rule declared by this court in Vimont v. S. S. Kresge Company, 291 S. W. 159, 160:

"The case at bar, therefore, seems to be governed in its entirety by the early case of Lark v. Bande, 4 Mo. App. 186, cited with approval by the Supreme Court as lately as the opinion of State ex rel. v. Trimble, *supra*. Such case declared the rule that, if the defendant directs a police officer to take the plaintiff into custody, he is necessarily liable to respond in damages for a resulting false imprisonment."

In Peterson v. Fleming, 222 Mo. App. 296, 303, this court held that if an individual requests an officer to make an arrest, the officer making such arrest may or may not be liable; ". . . but the only justification which the individual or unofficial citizen could invoke would be that the party arrested actually is guilty."

In Hanser v. Bieber, 271 Mo. 326, 336, the Supreme Court held: ". . . the plaintiff made out a *prima-facie* case when he intro-

duced evidence tending to show that defendants had caused his arrest and detention without a warrant.''

The burden was then on defendant to justify his action. The demurrer to the evidence was properly ruled.

Defendant next contends that, assuming it to be liable for plaintiff's arrest, yet it is not liable for his removal from the building, his incarceration in police headquarters, and his fingerprints being taken. Plaintiff's evidence was to the effect that after being questioned by Hanson, the policeman, he was placed in a patrol car and transported to police headquarters where he was booked ''for investigation as to labor activities,'' and confined in a cell with three other inmates; that the cell was filthy and there was no bed or chair; that he remained there until morning when he was forced to go through the ''showup'' room, with other prisoners; that he was not permitted at any time to communicate with his friends or family; and that he was ''fingerprinted,'' the prints being sent to the Federal Bureau of Investigation at Washington where they are kept in the criminal files. No objection was made to the introduction of any of this evidence. However, defendant excepted to plaintiff's Instruction No. 1, which permitted recovery for damages suffered after the original arrest, and it offered its instructions G, J, and H, which would have limited recovery to damages suffered from the arrest alone. The court refused to give said instructions.

Defendant relies on the following cases: Newman v. New York, L. E. & W. R. Co., 54 Hun. 335, 7 N. Y. S. 560; Rice v. Gray, 225 Mo. App. 890; Harbison v. Chicago, R. I. & P. Ry. Co., 327 Mo. 440, 453. We are unable to find in either of the above-mentioned Missouri decisions any declaration to the effect that one who is legally liable for the false arrest of another is not also legally liable to respond for all damages naturally and proximately flowing therefrom. We think the effect of said decisions is to exclude damages from being assessed against one when such damages are caused by the unlawful and unusual acts of other persons, such as police, and which acts might not be expected naturally to follow the arrest. Such was the situation in the last above-cited case where a stranger to the lawsuit personally abused plaintiff outside of the presence of defendants. It is not to be expected, for instance, that one who is placed under arrest will be physically injured, without provocation, by a police officer while in legal custody. Plaintiff's Instruction No. 1 does not permit such a recovery, nor was there evidence of such a character.

In the case of Pandjiris v. Hartman, 94 S. W. 270, 272, the Supreme Court held:

''. . . the citizen causing the arrest is liable in a civil action for whatever damages the arrested man sustained in consequence of his arrest *and imprisonment.*'' (Italics ours.)

. In Oliver v. Kessler, 95 S. W. (2d) 1226, 1229, the St. Louis Court of Appeals held:

"Plaintiff is entitled to recover for all injuries sustained by him resulting *naturally* and *proximately* from his wrongful arrest *and* imprisonment." (Italics ours.)

Certainly, when one is placed under arrest, it naturally follows that he will be imprisoned unless he makes bond, and that, while imprisoned, he will be subjected to questioning, probably "fingerprinting" and to other inconveniences, humiliations and hardships. This court recently held (Daniel v. Phillips Petroleum Company, 229 Mo. App. 150, 73 S. W. (2d) 355, 359, 360), that ". . . plaintiff was *arrested and incarcerated in jail* as the direct result of the act of defendant." We there said that we would not consider the actions of the police, other than those incidental to the acts of defendant, as a basis for liability of defendants. Plaintiff's Instruction No. 1 permitted recovery on the correct theory, and the court properly refused defendant's instructions G, J and H.

Defendant complains that the amount of actual damages allowed, $3750, is excessive. It has been often declared by the courts of this State that the question of the amount of actual damages to be allowed in this kind of case is within the sound discretion of the jury and that the court, on appeal, will not order *remittitur* unless it can be said that the verdict was clearly the result of prejudice, passion, or malice. [Hill v. S. S. Kresge Co., 217 S. W. 997, 999; Carp v. Queen Ins. Co., 203 Mo. 295, 360, 101 S. W. 78, 98, 99; Oliver v. Kessler, *supra*; Peterson v. Fleming, *supra*.] Plaintiff's station in life, the nature of his vocation, etc., are all to be considered. Here plaintiff was an engineer and he was arrested on suspicion and booked for investigation in connection with labor activities with which he in fact had had nothing to do. His fingerprints were placed on file with the criminal division of F. B. I. He suffered hardship and humiliation. There is no question but that his actual damages were substantial and we cannot say that the judgment was excessive.

Defendant says that plaintiff was not entitled to punitive damages and that, if he was, the amount assessed is excessive. There was substantial evidence in this case tending to prove that defendant's agent caused the arrest of plaintiff; that plaintiff had not committed any offense nor offered or threatened to do so; and that no offense had been committed by anyone at that time; and that Ulmer could more easily have disposed of plaintiff by telling him that he could not see the machinery, than he did by telling a policeman to "take charge of him." If Ulmer acted as plaintiff said he did he acted without probable cause or justification, and no justification is offered.

Plaintiff's arrest without probable cause constituted legal malice. Consequently punitive damages are assessable. [Newport v. Mont-

gomery Ward & Co. (Mo.), 127 S. W. (2d) 687, 690; State ex rel. United Factories, Inc., v. Hostetter, 126 S. W. (2d) 1173, 1176.]

The object and purpose of punitive damages is to punish the wrongdoer so that he may be deterred from so acting in wanton disregard of the rights of others in the future. [Randol v. Kline's, Inc., 330 Mo. 343, 360.] The amount of the award of punitive damages is not dependent upon the amount of the award for actual damages. [State ex rel. St. Joseph Belt Ry. Co. v. Shain, 108 S. W. (2d) 351, 356.] In the final analysis, the amount to be assessed rests within the sound discretion of the jury. [Newport v. Montgomery Ward & Company, *supra.*]

"Exemplary damages are inflicted by way of punishment for the doing of an act maliciously and are proportioned to the degree of malice, criminality, or contumely characterizing the act, to the age, sex, health, and character of the injured party, the intelligence, standing and affluence of the tort-feasor, and other like circumstances. These distinctions are pointed out in the cases cited by relator." [State v. Shain, 108 S. W. (2d) 351, 356.]

Defendant was the owner of the Fidelity Building, which building was encumbered in the principal sum of $1,740,000. Defendant's capital structure was $500,000, a part of which was surplus.

Considering all of the facts and circumstances of this case in relation to the judgment of $3750, for punitive damages, we are not justified in interfering therewith.

The judgment is affirmed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.