Doris G. TERRY and Paula Jean Terry,
Plaintiffs and Respondents,

v.

ZIONS COOPERATIVE MERCANTILE
INSTITUTION and John Does I and
II, Defendants and Appellants.

No. 16065.

Supreme Court of Utah.

Dec. 7, 1979.

Ronald R. Stanger, Provo, for plaintiffs and respondents.

MAUGHAN, Justice:

This appeal is from an order of the District Court denying defendant's motions for a judgment notwithstanding the verdict and for a new trial. Following a jury verdict in favor of the plaintiff, Doris G. Terry, for malicious prosecution, false arrest and false imprisonment, the defendant, Zions Cooperative Mercantile Institution (hereinafter "Z.C.M.I."), requested a judgment notwithstanding the verdict or in the alternative for a new trial or a remittitur of the damages. The District Court denied the motions for a judgment notwithstanding the verdict and for a new trial, but granted the remittitur motion on condition that the plaintiff accept a reduction of the punitive damages or the court would order a new trial. The plaintiff, Doris G. Terry, accepted the reduced amount in lieu of a new trial. Following defendant's appeal, however, plaintiff cross-appealed the granting of the remittitur motion and the reduction of the punitive damage award. We affirm the denial of the judgment notwithstanding the verdict and the new trial motion, but reverse the remittitur and reinstate the jury award. All statutory references are to Utah Code Annotated, 1953, as amended.

On December 22, 1976, the plaintiff and her daughter, Paula Jean Terry,[1] arrived at the Orem Branch of defendant's store with the express purpose of consummating the plaintiff's Christmas shopping.[2] Upon entering the store, the pair, proceeded to the men's department where they purchased several articles of clothing. This merchandise was properly paid for, wrapped and secured in distinctively marked bags. From the men's department, which is located on the first floor, the pair went to the third

Tim Dalton Dunn of Hanson, Russon, Hanson & Dunn, Salt Lake City, for defendants and appellants.

1. While Paula Jean Terry was also a party in the District Court, no appeal has been taken from the jury's verdict of no cause of action on her claims and she is not considered a party for this appeal.

2. The evidence adduced at trial indicated that Doris Terry was hospitalized for a blood clot during this time and was released just prior to December 22, 1976. Her intent to complete her shopping is substantiated by the fact that on the evening in question she had in her possession approximately $400 in cash.

floor to examine certain household items as possible gifts for one of the plaintiff's sons.

Upon reaching the third floor, Paula Jean became interested in a display of specially pre-wrapped fondue sets.[3] Paula Jean picked up one of the sets and asked her mother, the plaintiff, if the set would be an appropriate gift for her brother. The plaintiff's reply was to the effect, "whatever you (Paula Jean) want to buy" would be fine.

With this pre-wrapped fondue set in hand, Paula Jean and the plaintiff moved to another part of the third floor to examine the store's selection of vacuum cleaners. Finding none satisfactory, the pair decided to return to the first floor to look at the watches displayed there. While the pair moved about the store, the plaintiff was carrying her package from the men's department and Paula Jean was openly carrying the pre-wrapped fondue set and a package from the men's department.

During her initial examination of the fondue sets, two Z.C.M.I. security operatives were alerted to Paula Jean's activities. Although one of the operatives left the area in response to a prior problem, the second, Richard W. Goddard (hereinafter "Goddard"), initiated covert surveillance of Paula Jean. This surveillance led Goddard to the first floor following the two women.

What subsequently transpired on the first floor represents the crucial factual dispute of the case. While Goddard testified that he intercepted the pair outside the boundary of the store,[4] the plaintiff and her daughter testified that they both were within the store when first approached by Goddard. According to the plaintiff's testimony, upon reaching the first floor she moved away from her daughter searching for the watch displays. As she found the displays and turned to summon Paula Jean, she saw Goddard approach her daughter and say something to her. The plaintiff further testified she then walked over to where the two were talking and upon inquiring as to what was going on was asked to go upstairs with her daughter and the security operative Goddard.

While acknowledging certain initial embarrassment, both women testified they originally thought Goddard merely wanted them to return to the third floor to pay for the fondue set. The subsequent attempt by Paula Jean to pay for the item was thwarted by Goddard, who shepherded them into Ronald M. Farley's office.[5] After waiting there a short time Ronald M. Farley (hereinafter "Farley") entered the office, addressed the two women and then retired to the hallway to confer with Goddard. The specifics of Farley's initial exchange were actively disputed at trial but concerned the possibility of the store lodging a shoplifting charge against the women, a search of Paula Jean's purse and the presentation to the women of certain forms which they were requested to sign.[6]

---

3. The fondue sets were displayed on tables set up in the main hallway adjacent to the escalators. For security reasons they were pre-wrapped in a distinctive colored paper which would alert the store's security personnel to improper movement of the items.

4. This Z.C.M.I. Branch store is located in a shopping mall. The line of demarcation between the store and the central mall area is a small metal track within which a metal screen sets when the store is closed. Although there is a differentiation in the floor surfaces between the store and the mall area the change is subtle and can, by the arrangement of displays, seem non-existent. Therefore, a person could be standing outside the actual boundaries of the store and yet believe they were still within the store.

5. Ronald M. Farley was at that time the vice-president of the Orem store whose several duties included supervision of store security.

6. The forms consisted of a brief statement entitled "Admonition of Rights" which briefly outlined a person's rights upon arrest, and an untitled form which contained personal information, questions and a statement of confession to the effect, "on the above mentioned day and date, I entered Zions Cooperative Mercantile Institution and while there took without making payment, the below mentioned items which are the property of Zions Cooperative Mercantile Institution." Paula Jean signed both forms at Farley's insistence, after questioning Farley as to the meaning of the "confession statement" and protesting that while she took the item she never left the store or stole the item in question and merely "took" it from

Farley testified that at no time did he ask the women whether they were guilty of shoplifting, or had been shoplifting or make any other inquiry concerning their version of the preceding incident. In fact, Farley testified it was not a prerequisite to an arrest to discuss directly with the parties involved the questioned incident but rather he could act upon the report and impressions of the store's security operatives.

After a brief conversation with Goddard in the hallway, Farley returned to the room and reported Z.C.M.I. was arresting the pair for shoplifting. Upon hearing this the women remonstrated to Farley the situation, their intent to spend the entire evening shopping and their innocence. Farley was unresponsive to these efforts.

By the time the police arrived the plaintiff was experiencing a noticeable emotional reaction to the arrest and activities incident to it. As Paula Jean testified, ". . . my Mom just came unglued." When the police handcuffed the plaintiff she was extremely upset and weakened by her emotional state. Upon Farley's suggestion the police escorted the women down the back stairway and out of the store by the most inconspicuous route. The plaintiff was so weakened by her emotional reaction that she required physical aid to get down the stairway.

As the handcuffed women left the store in the company of the police, Doris Terry was recognized by a co-worker who approached Doris to inquire about her well-being. The co-worker was rebuffed by the policeman and told that she could not talk to the plaintiff. The women were taken to the police station, booked, fingerprinted, photographed and incarcerated. Because of the plaintiff's emotional state the pair were released on their own recognizance.

Following the above incident the plaintiff surrendered her job due to embarrassment and humiliation and undertook psychiatric therapy. Her psychiatrist, Dr. Delbert Perry Peterson testified the plaintiff was suffering from severe depression and was suicidal. He further testified that as a result of this depression Doris Terry was 70 to 90 percent disabled and that he had written a letter to the Disability Determination Unit of Social Security to this effect in an effort to get the plaintiff disability payments. Although he explained the plaintiff had reason to be depressed prior to the incident in question[7] and had suffered some mild depression, it appeared to him, "that the arrest at Z.C.M.I. caused this severe depression."

The pivotal issues in this case resolve into the following categories: (A) The existence of probable cause to arrest the plaintiff; (B) Which party has the burden of proving reasonableness of action or the existence of probable cause to arrest; (C) The exclusion of certain evidence; (D) The limitation on defendant's cross-examination of plaintiff and her expert witness; (E) The right of plaintiff to cross-appeal, after accepting the remittitur award; and (F) The availability of punitive damages. Our analysis of defendant's claims concerning the alleged District Court errors will follow this division.

(A) Probable Cause.

The Utah Legislature has responded to the pervasive problems that merchants experience in relation to the protection of their goods from shoplifting by granting the merchants certain statutory immunity from civil suits growing out of the detention and arrest of suspected shoplifters. Specifically, Section 77–13–32 provides:

A peace officer or a merchant, merchant's employee, servant or agent who causes such detention of a person as provided in Section 77–13–30,[8] or who causes

---

one department to another. The plaintiff Doris Terry signed only the admonition of rights form.

7. Specifically, within approximately a year of the Z.C.M.I. incident the plaintiff's mother, husband and a close uncle had died.

8. Section 77–13–30 provides: A peace officer or a merchant, a merchant's employee, servant or agent who has reasonable and probable ground for believing that goods held or displayed for sale by the merchant have been taken by a person with intent to steal may, for the purpose of investigating such unlawful act

the arrest of a person for larceny of goods held or displayed for sale shall not be criminally or civilly liable where the peace officer, or merchant, merchant's employee, servant or agent has reasonable and probable grounds for believing that the person detained or arrested committed larceny of goods held or displayed for sale.

The statutes [9] incorporate and apply the common law defense of good faith and probable cause, which is usually granted exclusively to peace officers,[10] to detentions and arrests undertaken by merchants, merchant's employees, servants and agents. The standard governing such conduct (in civil suits for wrongful arrest) is composed of two elements. The first is subjective and the second is objective. The officer or merchant must allege and prove not only that he believed in good faith that his conduct was lawful, but also that his belief was reasonable.[11] Therefore, under Section 77–13–32, even if the crime was not in fact being committed or attempted,[12] if the defendant, "in good faith believes that such facts are present as to lead him to an honest conclusion that a crime is being committed by the person to be arrested," then he may not be held liable for false arrest.[13] In determining the reasonableness of the conclusion, the test to be applied is one that is practical under the circumstances, i. e., whether a reasonable and prudent man in his position would be justified in believing facts which would warrant making the arrest.[14]

Since a dispute exists concerning the principal facts, the determination of reasonableness and probable cause is a question of fact for the jury to decide. Only if the facts were undisputed would this determination be a question of law for the court to determine.[15] This determina-

and attempting to effect a recovery of said goods, detain such person in a reasonable manner for a reasonable length of time.

9. The statutes include Sections 77–13–32, Section 77–13–30 and Section 78–11–18. The latter section is expressly limited to situations where the detention is directed at the recovery of the merchandise unlawfully taken and therefore more limited in scope than the other sections.

10. In *Cervantez v. J. C. Penney Co., Inc.*, 24 Cal.3d 579, 156 Cal.Rptr. 198, 595 P.2d 975 (1979), the California Supreme Court in interpreting Section E of the California Penal Code, Section 790.5, held the exclusion of the term arrest from the immunity statute foreclosed the extension of the common law probable cause immunity to arrests by merchants. At common law a private person was authorized to make an arrest for a public offense committed or attempted in his presence. This falls substantially short of a peace officer's right to arrest when he has probable cause to believe a misdemeanor is being committed in his presence. In *Cervantez*, the California Supreme Court concluded that to extend this common law probable cause immunity to a private citizen, i. e., merchant or merchant's employee, without specific legislative authorization would constitute a substantial further encroachment on the individual's right to liberty and thus detrimentally influence the delicate balance between that right and the property owner's private interest in preventing the theft of his prop-

erty. This problem is alleviated in Utah, however, because Section 77–13–32 expressly grants the immunity to arrests by merchants.

11. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 456 F.2d 1339, 1348 (2nd Cir. 1972).

12. Section 77–13–4 provides that a private person may arrest another: "(1) For a public offense committed or attempted in his presence." This stood as the only basis for a valid arrest by a private person for a crime of lesser degree than a felony, e. g., shoplifting, prior to the enactment of Section 77–13–32.

13. *Rodarte v. City of Riverton*, Wyo., 552 P.2d 1245, 1259 (1976). The merchant must also act in a reasonable manner at the time of the arrest or detention to fall within the protection of the statute.

14. *State v. Eastmond*, 28 Utah 2d 129, 132, 499 P.2d 276, 278 (1972).

15. The standard is generally stated as: "The question of probable cause is a mixed one of law and fact. The court submits the evidence offered to the jury with instructions as to what will amount to probable cause if proved. If the facts are undisputed, the question is one of law to be determined by the court." 22 Am.Jur., False Imprisonment, Section 218, p. 429. Under this standard if the question of reasonable or probable cause for the detention of a customer is undisputed, it is one of law for the

tion is unique for each factual situation and every person involved. The presence of a person in the company of one suspected of a crime does not as a matter of law establish probable cause for the arrest of that person.[16] Circumstances and facts sufficient to constitute probable cause to arrest or detain a person must exist independently from the mere association of individuals. While the association may be a contributing factor in the overall determination, it standing alone cannot be the exclusive basis for probable cause to arrest or detain someone.

■ In the present situation, where a dispute as to the principal facts exists, the existence of other circumstances and facts and their sufficiency in creating a reasonable belief in the merchant that probable cause to detain and arrest the plaintiff existed is a question of fact to be resolved by the finder of fact. The jury's conclusion that the defendant did not act reasonably and had no probable cause to arrest the plaintiff evidences the lack of sufficient additional facts, in this case, to support the statutory defense. There is sufficient evidence in the record to support this conclusion. Therefore, the trial court did not err in denying defendant's requested instruction.

(B) Burden of Proof.

■ The defendant claims the trial court erred in allocating to it the burden of proving the existence of probable cause to arrest the plaintiff or that the defendant acted reasonably. Before the enactment of the immunity statutes of which Section 77–13–32 is an example, the general rule regarding the burden of proof in false arrest and false

imprisonment cases was the burden rested upon the defendant to justify the arrest or imprisonment by showing that it was effected under lawful authority, including the existence of probable cause, where that was a factor.[17] Generally, the presumption arises that warrantless arrests and subsequent imprisonment are unlawful and the burden of proving justification, in an action to recover for false arrest, rests on defendant.[18]

The issue presented by this case is whether or not the enactment of Section 77–13–32 alters this common law rule. The statute grants immunity from civil and criminal liability to peace officers or merchants, merchant's employees, servants or agents, who cause the detention or arrest of an individual, where the actor has reasonable and probable grounds for believing that the person detained or arrested committed larceny of goods held or displayed for sale. The statute in essence codifies the pre-existing common law defense of probable cause to effect an arrest and expands it to incorporate specific private persons in the shoplifting context. The statute provides an affirmative defense for the person making an arrest, i. e., reasonable and probable cause. However, since the averments of such a defense are taken as denied or avoided each element of the defense must be affirmatively proved and the burden of proof clearly rests with the person asserting the defense, i. e., the defendant.[19]

■ Therefore, the statute does not alter the common law rule. When the defendant seeks to justify the detention or arrest of a person, by reliance on this statute, it is

court, but if the evidence is conflicting, it is a mixed question of law and fact in which the trier of fact must determine which of the conflicting stories is true and the judge must decide whether this story satisfies the requirements of reasonable cause. See *Stienbaugh v. Payless Drug Stores, Inc.*, 75 N.M. 118, 401 P.2d 104 (1965); *Lukas v. J. C. Penney Corp.*, 233 Or. 345, 378 P.2d 717 (1963).

16. Justice Noble addressed this same problem in concurring in *Stienbaugh*, supra note 15, 401 P.2d at 108, where he stated, "the mere fact that (the plaintiff in a false arrest action) was

in the store with (a suspected shoplifter) cannot justify an inference that the (former) was guilty of shoplifting."

17. 32 Am.Jur.2d, False Imprisonment, Section 101, pp. 150, 151.

18. See *Isaiah v. Great Atlantic and Pacific Tea Company*, 111 Ohio App. 537, 174 N.E.2d 128 (1959).

19. *Schwartz v. Schwartz*, Nev., 591 P.2d 1137, 1140 (1979).

incumbent upon him to show reasonable and probable cause for believing items offered for sale by the mercantile establishment have been unlawfully taken by the plaintiff.[20]

### (C) Limitation of Evidence.

Defendant further contends the trial court erred in limiting its introduction of certain proffered evidence. The evidence concerned the prior arrest and conviction of the plaintiff for shoplifting.

On June 15, 1972, the plaintiff and one of her sons were detained by a local mercantile establishment for attempting to purchase an item of merchandise whose price tag had been tampered with. The plaintiff was subsequently arrested for the larceny theft of shoplifting. Concerning the arrest, Officer Gary W. Sessions reported:

> While in the process of booking Mrs. Terry (plaintiff) became hysterical and asked to get a handkerchief from her purse, at which time she swallowed several pills and capsules. I grabbed her, took her to the floor, called for assistance and began to remove the pills from her mouth, eight were removed, they were nytroglycerine, darvon and another unidentified type.

The plaintiff was arraigned and entered, without the aid of counsel, a plea of guilty to the charged offense.[21]

The defendant claims the trial court committed prejudicial error by not permitting the specific instances surrounding the prior conviction to come in substantively. The defendant argues since the essence of the plaintiff's claim is the present detention and arrest were the proximate cause of her depression, suicidal tendencies, consequent disability and damaged reputation, any evidence of prior trauma, suicide attempts or incidents involving her reputation is relevant and should be allowed to come before the jury.

Although the relevancy of the proffered evidence is crucial, the probative value of the evidence, standing alone, does not determine its admissibility. Circumstantial evidence, although relevant, may nevertheless be excluded by reason of the general principle that the usefulness of the evidence is more than counter-balanced by its disadvantageous effects in confusing the issues before the jury, or in creating an undue prejudice in excess of its legitimate probative weight.[22]

This principle has been codified in Rule 45, Utah Rules of Evidence, which provides:

> Except as in these rules otherwise provided, the Judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading a jury, or (c) unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered.

It is generally conceded the trial court is more competent, in the exercise of this discretion, to judge the exigencies of a particular case and, therefore, when exercised within normal limits, the discretion

---

**20.** *Isaiah*, supra note 18, 147 N.E.2d at 132.

**21.** At this trial the plaintiff testified she was not guilty of the prior offense but had rather pleaded guilty to "take the rap" for her juvenile son.

**22.** VI. Wigmore, On Evidence, Section 1904 p. 574 (3rd ed. 1940); Relevant evidence then is evidence that in some degree advances the inquiry, and thus has probable value, and is prima facie admissible. But relevance is not always enough. There may remain the question, is it worth what it costs? There are several counter-balancing factors which may move the Court to exclude relevant evidence if they outweigh its probative value. McCormick, On Evidence, Section 185 p. 438 (2nd ed. 1972); See *Byers v. Santiam Ford, Inc.*, 281 Or. 411, 574 P.2d 1122, 1124 (1977); This concept has been termed "legal relevance." See *Wright v. Hartford Accident and Indemnity Company*, 580 F.2d 809, 810 (5th Cir. 1978).

should not be disturbed.[23] The general rule followed by this court is the judgment of the trial court will not be reversed unless it is shown that the discretion exercised therein has been abused.[24]

 The defendant wished to introduce evidence of the prior conviction and its surrounding facts as affecting the issue of damages.[25] However, evidence relating only to damages may properly be excluded because in the context of the trial its value on the issue of damages is outweighed by its prejudicial effect on the principal issue of liability.[26] Due to the similarity of the incidents and the substantial likelihood that the introduction of the former incident will confuse and mislead the jury, the trial judge should exercise every reasonable precaution to protect the party's rights.[27] The trial judge effectuated this protection by restricting the evidence admitted to the fact of the prior act and the identity of the party involved.[28]

 In his decision to exclude the substantive facts of the incident, the trial judge took into consideration the delay and confusion that would result from a re-trial of the prior conviction,[29] the remoteness of the prior act,[30] and the tendency the proffered evidence would have to mislead and prejudice the jury.[31] By considering these factors and basing his decision upon conclusions drawn from these considerations, the trial judge did not abuse his discretion in excluding the evidence of the prior acts. When the trial judge weighs the matter and makes the determination, his ruling should be looked upon with indulgence and not disturbed unless it clearly appears that he abused his discretion.[32] We hold that the trial judge committed no error in limiting the introduction of this evidence.

**23.** *Brigham Young University v. Lillywhite,* 118 F.2d 836, 841, (10th Cir. 1941).

**24.** *Bambrough v. Bethers,* Utah, 552 P.2d 1286, 1290 (1976); See also *Texas Eastern Transmission Corporation v. Marine Office-Appleton and Cox Corp.,* 579 F.2d 561, 567 (10 Cir., 1978); *Roberts v. Atlantic Richfield Company,* 88 Wash.2d 887, 568 P.2d 764, 768 (1977); 5 Am.Jur.2d, Appeal and Error, Section 881, p. 320.

**25.** The defendant alleged this evidence showed plaintiff had suicidal tendencies prior to the Z.C.M.I. incident, or the incident in question was not the proximate cause of the plaintiff's depression. The defendant also wanted to introduce the evidence to illustrate the present reputation of the plaintiff in an effort to refute the plaintiff's allegations of harm to her reputation.

**26.** *Bernstein v. Connecticut House, Inc.,* 127 U.S.App.D.C. 156, 381 F.2d 935 (1957).

**27.** *Kurn v. Radencic,* 193 Okl. 126, 141 P.2d 580, 583 (1943).

**28.** The trial judge restricted the admission of the evidence by authority of Rule 6, Utah Rules of Evidence, which states: "When relevant evidence is admissible as to one party or for one purpose and is inadmissible as to other parties or for another purpose, the judge upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."

**29.** The prior arrest was followed by a guilty plea by the plaintiff. Due to the lack of a trial on the merits in the first instance many controverted points concerning that incident would have to be tried for the first time at the present proceeding.

**30.** Remoteness usually goes to the weight of the evidence and not its admissibility. See *Weber Basin Water Conservancy District v. Ward,* 10 Utah 2d 29, 32, 347 P.2d 862, 864 (1959). However, in determining the admissibility of evidence the trial judge should consider any reduction in the probative value resulting from the remoteness of the prior incident. Since the decision to exclude relevant evidence involves a delicate weighing process, the extent of the probative value of the evidence must be considered by the trial judge, and, where "the probative value of offered evidence is not great, any such probative value may be outweighed by considerations such as those of surprise, unfairness, confusion of the jury, and prolonging of a trial." *Plourd v. Southern Pacific Transportation Co.,* 266 Or. 666, 513 P.2d 1140, 1149 (1973).

**31.** Evidence is unfairly prejudicial in this context if it has a tendency to influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions of the case. *Lease America Corp. v. Insurance Company of North America,* 88 Wis.2d 395, 276 N.W.2d 767, 770 (1979).

**32.** *Bullock v. Ungricht,* Utah, 538 P.2d 190, 192 (1975).

**(D) Limitation of Cross Examination.**

Concurrent with his ruling on the inadmissibility of the attendant facts surrounding plaintiff's prior arrest, the trial judge restricted the defendant's use of this evidence in impeaching the testimony of the plaintiff and her expert witness. The defendant claims limitation of this cross examination to the facts of and character of the prior conviction represents reversible error. We disagree.

This court has previously announced there is no settled and arbitrary rule defining the limits within which cross examination must be confined. The latitude that may be allowed is largely within the discretion of the trial court, to be exercised and governed by the facts and circumstances of each particular case.[33] Also, the general principle of appellate practice that a ruling of the court below in a matter within its judicial discretion will not be disturbed on appeal in the absence of a clear abuse of that discretion, has been applied by this court to appellate review of rulings on evidentiary matters.[34]

With these general principles in mind we turn to the problems posed by the present case. The plaintiff, Doris Terry, was involved in a prior shoplifting incident in 1972. As detailed earlier, the arrest and booking were traumatic and resulted in what one observer labeled a "suicide attempt." Doris Terry eventually entered a guilty plea to the charge and paid the fine. When the plaintiff took the stand in the present action the defendant wished to counter statements which she made and generally attack her credibility as a witness by reference to the circumstances surrounding the prior incident.[35]

While originally ruling the prior conviction could not be used to impeach the testimony of the plaintiff, the court subsequently allowed the defendant, on direct examination, of Doris Terry (called as an adverse witness) to establish the fact of the prior conviction and its character. However, at no time did the trial court allow the defendant to introduce evidence of the facts surrounding the prior arrest and conviction.

The question of the use of prior convictions to impeach party testimony is governed by rule and statute. Rule 21, Utah Rules of Evidence, provides:

Evidence of the conviction of a witness for a crime not involving dishonesty[36] or false statement shall be inadmissible for the purpose of impairing his credibility, except as otherwise provided by statute.

While the statute restricts the use of evidence of past crimes for the purpose of impeachment, it does not demand the admission of crimes involving dishonesty or false statements for the purpose of impeaching a witness. Although the statute speaks of the inadmissibility of certain crimes, concerning the admission of past convictions the rule is silent. We regard this silence as significant and establishing a permissive approach to the introduction of such evidence. Particularly is this so when viewed in light of the terms of Rule 45, Utah Rules of Evidence. The rule allows the operation of sound judicial discretion to monitor the introduction of evidence of prior misdemeanor convictions.[37]

---

**33.** *State v. Shockley*, 29 Utah 25, 80 P. 865 (1905).

**34.** *Bullock*, supra note 32, at 192; See 5 Am. Jur.2d, Appeal and Error, Section 881, p. 320.

**35.** On direct examination Doris Terry stated that the Z.C.M.I. incident was "just the most terrifying thing that I have ever been through. That was just horrible. It was just a living nightmare. That's all it has been." The plaintiff also stated, "I never stole one thing and I never had no intentions of stealing anything. It just wasn't for me to do anything like that."

**36.** Any crime involving the theft of another person's property is generally considered as involving dishonesty. See *Gordan v. United States*, 127 U.S.App.D.C. 343, 383 F.2d 936, 940 (1967).

**37.** *State v. Hougensen*, 91 Utah 351, 64 P.2d 229 (1936). The California Supreme Court has reached the same conclusion concerning felony convictions. The California Evidence Code at Section 788 states: "For the purpose of attacking the credibility of the witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony." The California Su-

This discretion is, however, confined by the limitations inherent in Rule 45, and the balancing approach which it necessitates. Before a judge can exclude evidence of a prior conviction involving dishonesty or false statements, he must weigh its probative value against the risk that its admission will necessitate undue consumption of time, create substantial danger of undue prejudice or of confusing the issue or of misleading the jury, or unfairly and harmfully surprise a party.[38]

The considerations underlying this balancing approach were aptly stated by Justice Wolfe in *State v. Hougensen* [39] when he explained:

> . . . There are two opposing considerations which press themselves on the court. The courts have recognized that the testimony of a dissolute person is generally not to be given the credence of a person of upright character; that the value of the evidence largely depends on the type of vehicle which brings it to the courtroom. Therefore, it has strongly appealed to the sense of justice that the cross-examiner should be able to reveal to the jury the sort of person who gives the testimony and that the jury is entitled to take that into account as one of the very important basis for determining the value of any person's testimony. . . . On the other hand the courts have also recognized that collateral facts as to a witness's conduct in order to reveal his character ofttimes form no reasonable basis for an assumption that he will not tell the truth, and simply prejudice the jury (*State v. Williams*, 36 Utah 273, 103 P. 250 (1909)), injures his or her reputation, and make witnesses who might otherwise be available very reluctant to offer testimony.

Consideration of the testimony's prejudicial effect is especially pertinent when the witness is the defendant in a criminal prosecution or a party in a civil case.[40] This is particularly important when, as here, the prior conviction is for the same type of crime involved in the matter under present consideration. In this type of situation, the probative value of the evidence as affecting the party's credibility will rarely outweigh the resulting confusion of the issues in dispute and the prejudice to the party.

In the present case the considerations of confusion and prejudice are amplified by the fact that the prior conviction was based on a guilty plea and not a full trial on the merits. As the trial judge recognized, any presentation of details from the prior incident would necessitate in essence a new trial of that incident and substantially delay the present proceeding.

By recognizing the possible prejudice resulting from the admission of the prior conviction on cross examination and the possibility of confusion and delay relat-

---

preme Court interpreted the "may" language as permissive and thus concluded that the choice of language leaves the trial court with discretion to exclude proof of prior felony convictions offered in impeachment. The court then concluded that this discretion is governed by Section 352 which is basically identical to Utah's Rule 45. See *People v. Beagle*, 6 Cal.3d 441, 99 Cal.Rptr. 313, 319, 492 P.2d 1, 7 (1972); See also *Luck v. United States*, 121 U.S.App.D.C. 151, 348 F.2d 763, 767–768 (D.C.Cir. 1965); Because the prior conviction was a misdemeanor we need not reach the issue of judicial exclusion of evidence of a prior felony conviction.

**38.** In a recent case the California Supreme Court explained this balancing requirement. *Basically the trial judge must consider the character of the prior crime as reflecting veracity and the remoteness of the conviction in his determination of the probative value of the* evidence. Against this probative value the trial judge must then weigh the factors outlined in Rule 45. See *People v. Woodard*, 23 Cal.3d 329, 152 Cal.Rptr. 536, 590 P.2d 391 (1979); See also supra note 30.

**39.** *Hougensen*, supra note 38, 64 P.2d at 233.

**40.** The rules of evidence speak generally to witnesses and not to criminal defendants or otherwise and it has been recognized in this and most other jurisdictions that the standards developed must be equally applicable to all witnesses. Therefore, the special considerations given a criminal defendant must be incorporated generally under the rules and are applicable to all witnesses. See *State v. Johnson*, 76 Utah 84, 99, 287 P. 909, 915 (1930); See also *Boyd v. City of Wyandotte*, 402 Mich. 98, 102, 260 N.W.2d 439, 441 (1977).

ed to that admission, the trial judge considered the relevant factors in deciding to restrict the cross-examination of the plaintiff. Since the trial judge, therefore, did not abuse his discretion we find no error in the ruling.[41]

Concerning the limitation of the cross-examination of the plaintiff's expert witness, Rule 55, Utah Rules of Evidence, allows for the admission of evidence of prior crimes or civil wrong committed on a specific occasion to prove a material fact other than disposition. This admission, however, is subject to Rule 45 and therefore within the discretion of the trial judge. As stated in *Bullock v. Ungricht*:[42]

> Rulings of this character on evidence which may have a dual effect: one of which, if considered separately, it may be deemed improper and incompetent; and another for which it would be proper and competent, are primarily the responsibility of the trial judge. When he weighs the matter and makes the determination, his rulings should be looked upon with indulgence and not disturbed unless it clearly appears that he erred in law or abused his discretion.

For the reasons set forth above and in the prior section the trial judge did not abuse his discretion in making this ruling and therefore committed no error.

### (E) Cross-Appeal.

Following the defendant's motion for a new trial or a remittitur of the damages, the trial court remitted the punitive damage award from $15,000 to $2,000 on condition that if it was not accepted by the plaintiff the trial judge would order a new trial. The plaintiff accepted the remitted amount. Subsequently, the defendant appealed the dismissal of its various alternative motions and the plaintiff cross-appealed the remittitur requesting reinstatement of the jury award. The defendant argues that the plaintiff is estopped from bringing the cross-appeal because of her acceptance of the remittitur. We do not agree.

Although the generally accepted rule provides that a party who accepts a remitted amount cannot thereafter appeal the propriety of the remittitur order,[43] we believe the rule should be limited to situations in which the party accepting the remitted amount attempts a direct appeal of the matter. Where the party who moves for the reduction, i. e., the defendant, institutes an appeal of the lower court proceedings, the plaintiff should be free to cross-appeal the amount of remittitur, notwithstanding the fact that he has previously accepted the reduced amount.

The Wisconsin Supreme Court cogently addressed this approach in the leading case of *Plesko v. City of Milwaukee*.[44] In reviewing the rationale for its decision that Court explained:

> The reasons motivating the majority to adopt the foregoing rules are these: The objective underlying the recommended procedure for granting an option to accept judgment for a reduced amount of

---

**41.** The restriction on the scope of cross-examination to the fact of and character of the prior conviction has become the general rule in this and many other jurisdictions concerning the introduction of prior felony convictions. See *State v. Younglove*, 17 Utah 2d 268, 409 P.2d 125 (1965); *State v. Kazda*, 14 Utah 2d 266, 382 P.2d 407 (1963); *State v. Palmer*, 98 Idaho 845, 574 P.2d 533 (1978); *Scott v. State*, 64 Wis.2d 54, 218 N.W.2d 350 (1974). This recognition of the prejudicial effect that the facts of a prior conviction has over and above any influence on the credibility of the witness is equally applicable in the present situation. The fact that the witness committed the prior crime and the nature of the crime committed are sufficient details to alert the jury to the plaintiff's past activities and their possible influence on her credibility. The only foreseeable purpose in introducing the explicit details of the prior incident to attack the credibility of the witness, would be to prejudice the jury against the plaintiff. This should not be allowed by the trial judge.

**42.** *Bullock,* supra note 32, at 192.

**43.** See *Donovan v. Penn Shipping Co., Inc., 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977);* Koenigsberger v. Richmond Silver Mining Co., *158 U.S. 41, 15 S.Ct. 751, 39 L.Ed. 889 (1895).*

**44.** *Plesko v. City of Milwaukee,* 19 Wis.2d 210, 120 N.W.2d 130 (1963).

damages in lieu of having a new trial, where the damages awarded by the jury are determined by the trial court to be excessive, is to avoid the delay and expense of an appeal or a new trial. In most situations, it is likely that the party will accept judgment for such reduced damages rather than undergo the expense, delay, and uncertainty of result of an appeal or new trial. Nevertheless, if a party found liable to pay damages appeals the judgment resulting from the other party's accepting such reduced damages, this objective has been negatived. When plaintiff is forced to undergo an appeal by the action of the opposing party, after plaintiff has accepted judgment for such reduced damages, it seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if plaintiff has accepted same only to avoid the delay and expense attending an appeal. Furthermore, the new rule herein announced may to some extent discourage appeals by the party held liable because of the possibility that the party who has accepted judgment for the reduced damages may prevail on his motion for review and have the jury's verdict reinstated.[45]

This court concurs in the rationale and result reached by the Wisconsin Court and holds that upon the instigation of an appeal by the defendant, following a successful remittitur motion, the plaintiff has a right to cross-appeal that decision notwithstanding his prior acceptance of the remitted award.[46]

**(F) Punitive Damages.**

We now turn to the issues surrounding the jury's award of punitive damages. On the first hand, defendant claims its acts were without malice and therefore no basis existed for the award of punitive damages. Secondly, the plaintiff's cross-appeal places the amount of the punitive damage award in issue.

▮ Generally in personal injury cases the rule is that before the jury can award punitive or exemplary damages the party against whom the damages are to be awarded must have acted wilfully and maliciously.[47] However, it has long been the rule that in false imprisonment cases punitive damages may be awarded when a wrongful act is done recklessly or in open disregard of one's civil obligations and the rights of others.[48]

▮ This presumed malice or malice in law does not consist of personal hate or ill will of one person towards another but rather refers to that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen.[49] Therefore, in false imprisonment cases the defendant need not act with actual ill will or hatred toward the person being confined. In such cases malice in law will be implied from unjustifiable conduct which causes the injury complained of or from a wrongful act intentionally done without cause or excuse.[50]

▮ The consequence of the application of this standard to the actions of a merchant, merchant's employee, servant or agent in arresting an alleged shoplifter is

**45.** Id. 120 N.W.2d at 135.

**46.** Several other jurisdictions agree with this conclusion. See *Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978); *Mulkerin v. Summerset Tire Service, Inc.*, 110 N.J.Super. 173, 264 A.2d 748 (1970); *Jangula v. Klocek*, 284 Minn. 477, 170 N.W.2d 587 (1959).

**47.** See *Prince v. Petterson*, Utah, 538 P.2d 1325 (1975).

**48.** *Fotheringham v. Adams Exp. Co.*, 36 F. 252, 253 (C.C.Mo.E.D.1888); See also *Bolton v. Vel-*

*lines*, 94 Va. 393, 26 S.E. 847 (1897); 32 Am. Jur.2d, False Imprisonment, Section 116, p. 163.

**49.** *Remmick v. Mills*, 165 N.W.2d 61, 71 (N.D. 1968).

**50.** Id. at 72; See also *ABC–Paramount Records, Inc. v. Topps Record Distributing Co.*, 374 F.2d 455 (5th Cir. 1967); *Farish v. Smoot*, Fla., 58 So.2d 534, 538 (1952); *Turk v. N. & W. Ry. Co.*, 75 W.Va. 623, 84 S.E. 569 (1915).

that malice in law, sufficient to support punitive damages, will be implied from a lack of probable cause in effecting the arrest.[51]

The jury's conclusion that Z.C.M.I. failed to fall within the immunity granted by Section 77–13–32 because its arrest of Doris Terry was unjustified and without probable cause establishes the prerequisite malice for recovery of punitive damages. The provisions of Section 77–13–32 provide a touchstone for actions of a merchant in arresting and detaining an alleged shoplifter. If the merchant acts in a reasonable manner and has probable cause to detain or arrest the person, he is granted complete civil and criminal immunity.

■ However, the statute does not condone acts by merchants in total disregard of the acknowledged rights of the persons detained and no immunity is granted where the merchant acts unreasonably or without probable cause. Activities of the merchant which fail to meet this standard provide the basis for exemplary and punitive damage awards. Therefore, the trial court committed no error in instructing the jury on the availability of punitive damages.

Turning to the amount of the punitive damages awarded, the jury awarded the plaintiff, Doris Terry, $4,000 in general damages for malicious prosecution, $2,500 in general damages and $15,000 in punitive damages for false arrest and false imprisonment. The trial judge, believing the punitive damages must bear a reasonable relationship to the actual damages reduced the punitive award to $2,000 and conditioned the grant of a new trial on the plaintiff's acceptance of that amount.

■ This court recently stated that "while the cases generally hold that the amount of punitive damages must bear some reasonable relation to the amount of actual damages awarded, this is not necessarily true." [52] The purpose of a punitive or exemplary damage award is not to compensate the party harmed but rather to punish the wrongdoer, to deter him from similar acts in the future, and to provide fair warning to others similarly situated that such conduct is not tolerated.[53]

■ Due to the purposes underlying the award of punitive damages many factors contribute in determining their appropriate measure. While the amount of compensatory damages awarded is one such factor, it is not the exclusive one. The jury in its original decision or the court in its review of that decision must also consider the particular nature of the defendant's acts, the probability of those acts being repeated in the future, and the relative wealth of the particular defendant.[54]

■ Because of the variables involved and the imprecision inherent in any award, the amount of the punitive award should be relegated to the discretion of the jury as related to the facts and circumstances of each case. Generally, the only limitation on this discretion is that the award must not be the result of passion and prejudice. The measure of the verdict might be so grossly excessive and disproportionate to the injury that this court would say, from that fact alone, that as a matter of law the verdict must have been arrived at by passion or prejudice. However, to support that conclusion, the verdict must be so excessive as to be shocking to one's con-

**51.** As distinctly stated by the court in *Helming v. Adams*, 509 S.W.2d 159, 168 (Mo.Ct.App. 1974), "Defendant's warrantless arrest of the plaintiff constituted the intentional doing of a wrongful act because, plaintiff, in fact, had committed no offense of any kind, either alone or as an aider or abetter in concert with Huckabee, and no reasonable grounds existed for defendant to believe that she had."; See also *McGill v. Walnut Realty Co.*, 235 Mo.App. 874, 148 S.W.2d 131, 136 (1941).

**52.** *Nash v. Craigco, Inc.*, Utah, 585 P.2d 775, 777 (1978).

**53.** *Prince,* supra, note 48, at 1329.

**54.** See *Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 928, 148 Cal.Rptr. 389, 399, 582 P.2d 980, 990 (1978). There the Court observed, "obviously, the function of deterrence (see fn. 13, ante) will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort."

science and to clearly indicate passion, prejudice or corruption on the part of the jury.[55]

■ While the present punitive award is substantially greater than the compensatory award, when the factors of the wealth of the defendant and the egregious disregard of the plaintiff's rights represented by the defendant's acts are considered, the size of the award does not shock our conscience. The trial judge erred in remitting the amount the jury awarded, and we reinstate that award in full.

WILKINS, J., concurs.

STEWART, J., concurs in result.

HALL, Justice (concurring and dissenting):

I agree that the trial judge did not err in denying the respective motions for judgment notwithstanding the verdict and for a new trial. However, I do not agree that he erred in remitting a portion of the punitive damages awarded. Rather, due to his advantaged position, I would defer to the judgment of the trial judge and would not disturb his findings by substituting our judgment for his.

The trial judge was in a unique position which afforded him the opportunity to observe the matter first hand and to sense the events and personalities involved and thus to guard against an award of punitive damages reflective of passion or animus. His determination that the damages in question must bear some reasonable relationship to the injury and actual damages suffered is in accord with the general rule of law on the subject.

The main opinion cites the case of *Nash v. Craigco, Inc.*[1] as authority for the proposition that we no longer adhere to the general rule and that punitive damages need not necessarily bear a reasonable relation to actual damages. I do not so view that case.

The facts in *Nash v. Craigco* are wholly different from those in the instant case. The plaintiff therein sought only *equitable* relief in the form of an order compelling compliance with an agreement to convey shares of stock and for punitive damages based upon the breach of a fiduciary duty. No actual money damages having been sought or obtained, the sole question presented on appeal was whether punitive damages were allowable in an *equitable* proceeding where relief other than financial was sought. In response to that question, this Court simply held that an award of compensatory damages is not a prerequisite to an award of punitive damages. Such a holding in no way disturbs the general rule, that *if* compensatory damages are awarded, then any punitive damages also awarded must bear some reasonable relation thereto.

In the case before us, both actual and punitive damages have been awarded. Hence, the general rule applies and the award of punitive damages should bear some reasonable relation to the award of actual damages.

I would affirm the judgment of the trial judge in all respects.

CROCKETT, C. J., concurs in the views expressed in the concurring and dissenting opinion of HALL, J.

---

**55.** *Pauly v. McCarthy*, 109 Utah 431, 184 P.2d 123 (1947).

**1.** Utah, 585 P.2d 775 (1978).